THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MORRIS CALDERON *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 79-450, 79-463 cons.

Opinion filed June 24, 1980.

James J. Doherty, Public Defender, of Chicago (Michael McInerney, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris W. Sholder, and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendants, Morris Calderon and Vincent Galvan, were charged by indictment with the murder of Jimmie Vargas. Calderon requested a bench trial which was conducted simultaneously with the jury trial of his co-defendant Galvan. Both defendants were found guilty of murder; they were sentenced, respectively, to serve 20- and 24-year terms in the State penitentiary. Each defendant appeals his conviction. We consider the following issues for review: (1) whether the police had probable cause to arrest defendant Calderon; (2) whether defendant Calderon was convicted of murder beyond a reasonable doubt; (3) whether defendant Galvan was convicted of murder beyond a reasonable doubt; and (4) whether the prosecutor's remarks during closing argument were improper.

For the reasons hereinafter set forth, we affirm the convictions of both defendants, Calderon and Galvan.

Jimmie Vargas (hereinafter referred to as the victim) was fatally wounded when shots were fired into a group of people gathered in front of the building at 2611 South Sawyer in Chicago, Illinois. The incident occurred at approximately 10 p.m. on July 21, 1977, and the victim

subsequently died on August 1, 1977, as the result of the shooting. Defendants Calderon and Galvan were indicted for the murder of Vargas. Prior to trial, both defendants moved to quash their arrests and to suppress their subsequent identification. The evidence adduced at the hearing and the trial follows.

Galvan testified that at approximately 11:30 p.m. on the night in question he and Calderon, both members of the "Latin Kings" street gang, were riding in the latter's blue 1965 Mustang when they were stopped by police officers. Defendants got out of their car and when they told the police their names, they were handcuffed and arrested. They were placed in the back seat of the squad car and transported to St. Anthony's Hospital. One officer drove them, and the other officer followed in Calderon's automobile. While the squad car was parked in front of the hospital, five members of the "Ambrose" street gang approached defendants and yelled, "We got you now; don't think you are going to get away with this."

Calderon's testimony substantially corroborates Galvan's recitation of the events of the night in question. However, Calderon added that he met Galvan at approximately 9:30 p.m. and the two proceeded to drive around. They made one stop where a girl took a photograph of them and then they went to the residence of Ralph Perea where they remained from approximately 9:45 p.m. to 10:50 p.m.

Investigator Steven Steele, a Chicago police officer, testified that on the night of July 21, 1977, he and his partner, investigator John Schaefer, were patrolling when they received a "flash message" regarding a suspect, Vince Galvan, and an older model blue Mustang, wanted in connection with a shooting. The officers were not given a description of any other suspect or any other names of individuals in connection with the crime. Within a short period of time the officers noticed a blue Mustang, which they stopped. Galvan, who was the passenger, got out and approached the officers. When defendant Galvan gave the officers his name, both defendants were arrested and placed in the squad car. Officer Steele called the radio dispatcher and was informed that the persons involved with the shooting were at St. Anthony's Hospital. Officer Schaefer drove defendants to the hospital in the squad car, and Steele followed in the Mustang. Upon arrival at the hospital, Steele noticed a group of "Latins" approach the squad car, "yelling, that's them, that's the car." In denying defendants' motion to quash the arrests the trial court stated:

> "Nothing wrong with the stopping of the car. Apparently, the description was good enough to get the guy they wanted to, namely, Vincent Galvan. I see nothing wrong with the police arresting the two individuals in the car because of the shooting. I see nothing wrong with going over to St. Anthony's Hospital."

Donasiano Limes testified that on July 21, 1977, at approximately 6:30 p.m. he arrived at 2619 South Sawyer where he remained for several hours. He sat outside the building with a group of people, some of whom were fellow members of the "Ambrose" street gang. During this time he consumed about a quart of beer. At approximately 9:40 p.m. he saw both defendants drive past the building in a blue Mustang with a black vinyl top. Limes knew that both Calderon and Galvan were members of the "Latin Kings" and that Galvan had previously been a member of the "Ambrose" but had changed gangs. He knew Calderon only by the nickname "Moe." About 20 minutes later Limes was sitting on the front steps of the house at 2618 South Sawyer when he heard a gunshot, followed by a short silence and then four or five more shots. There were bushes in front of the steps where Limes sat, and there were cars parked on both sides of the street. Upon hearing gunshots, Limes looked across the street and saw Galvan fire the shots and noticed Calderon with him in the gangway. He "stooped down" and went behind some bushes that were to the left of the steps. After the firing ceased, he looked up and saw both defendants run down the gangway to an alley where there was a blue Mustang. Although Limes originally testified that the gangway was directly across from the 2619 South Sawyer building, he later stated that the gangway was located two houses south of the building and across the street. After the last shot was fired, Limes went to the victim and took him to St. Anthony's Hospital. At the hospital Limes described to police officers what he had seen. He stated that he described "Moe" to the police as wearing a Latin Kings' sweater. He later saw both defendants at the hospital.

Marvin Olvera testified that he was a member of the "Ambrose" street gang. He admitted that he had previously been convicted of armed robbery and of contributing to the delinquency of a minor. On the night in question he arrived at 2619 South Sawyer at about 7 p.m. He began drinking at about 9 p.m. and consumed a quart of beer. At 9:30 he saw Galvan and Calderon drive past the building in a blue Mustang with a black top. He stated that Galvan had previously been a fellow member of the Ambrose gang but was a member of the Latin Kings on the night in question. At 10 p.m. Olvera heard a gunshot, followed by several other shots. He was standing on the left side of the stairs when the first shot was fired, and he "started to drink" and moved around some bushes. He testified that he saw Galvan standing in the gangway across the street and that Galvan was firing the shots. Calderon was with Galvan at the time and was wearing a black and white sweater. He stated that after the firing ceased, he ran across the street and down the gangway after the shooters. He further testified that he observed the defendants enter a blue Mustang with a black vinyl top and leave the scene. Olvera stated that he had seen

two people and a "shadow," although at the preliminary hearing in this matter he stated that there "was a third person in there." Additionally, he testified that he had told plainclothes police officers that he had seen three individuals at the time of the shooting. He did not give a description of the assailants to the police officers at the scene, although he did tell them the names of the individuals involved whom he had seen.

George Valera was also a member of the Ambrose and knew that Galvan had previously belonged to that gang but had shifted his allegiance to the rival gang of Latin Kings. He also knew Morris Calderon as "Moe." Valera had previously been placed on probation for "carrying a gun." On July 21, 1977, he arrived at 2619 South Sawyer at approximately 6 p.m. Although he was only 17 years old at the time, he was drinking beer with various members of the Ambrose and their friends. At 10 p.m. he was standing on the sidewalk in front of the building. He stated that he saw Galvan fire the shots from the gangway across the street and that Calderon was with him. He had seen both defendants about 15 to 20 minutes earlier when they drove past the building in a blue Mustang. Valera testified that the lighting on the street was "good," although the street light was on the east side of the street, near the building, and not across the street by the gangway. After the first shot was fired, there was a pause. When shooting resumed shortly thereafter, Valera looked to see who was firing the shots. After the shooting stopped, Valera transported an individual named "Artie" who had been shot in the arm, to St. Anthony's Hospital. In the emergency room Valera spoke with police officers and stated that he told police that the man firing the shots was wearing a white "t-shirt" and black pants, and that "Moe" was wearing a black and yellow sweater (which was the symbol of the Latin Kings). Valera and several friends returned to 2619 South Sawyer where he stayed for 20 to 30 minutes and discussed the possibility that they "were going to get some Kings." They returned to the hospital at approximately 11:30 p.m. where they saw Calderon and Galvan in the custody of police officers. They approached the squad car and indicated that defendants were the perpetrators of the crime.

Joseph Flores, a Chicago police officer, testified that he and his partner, Robert Major, drove past 2619 South Sawyer on July 21, 1977, at about 9:30 p.m. They stopped and told the large group that had gathered in front of the building that people had complained about loud music and drinking. The officers told the group to stay off the sidewalk. At 10:15 p.m. they saw people from the group "waving their hands and yelling to us." They observed that two men on the scene had been shot, and they placed the victim, Jimmie Vargas, who had received a head wound, into the squad car and took him to the emergency room of St. Anthony's Hospital. At the hospital Flores spoke with Limes and Valera. Pursuant to their

conversation, the officer immediately (about 10:30 p.m.) sent out a "flash message" which included the name "Vince Galvan" and the description of a 1969 or 1970 blue Mustang. Flores testified that Limes and Valera stated that there were three offenders, but he did not recall whether they gave a description for offenders number two and three. The officer made a report on the incident, but this report did not contain the names of any other offenders. Additionally, the officers testified that if the car had been described to them as having a "black vinyl top," this description would have been included in the "flash message."

Steven Steele, an investigator for the Chicago Police Department, gave substantially the same testimony as elicited from him at the hearing on the motion to quash defendants' arrest. On the night in question he received a "flash message"; he later apprehended defendants Galvan and Calderon and transported them to St. Anthony's Hospital where they were identified by several persons who approached the squad car.

After the State rested its case, defendant Calderon presented no evidence on his own behalf and also rested his case. Defendant Galvan presented the following evidence.

Stanley Sacks, an assistant public defender, testified that on August 18, 1977, he went to 2619 South Sawyer. Mr. Sacks is approximately six feet one inch tall, and he stated that the shrubbery in front of the building was four feet high and six feet high in some places. He testified that he could not see the gangway across the street very well.

Dorothy Santillan testified that on the night in question at 6 p.m. she was at her home at 2349 South Homan with her two sons, Joseph and Alex, and defendant Vincent Galvan. The four were sitting on the porch and later ate dinner. At 9:30 p.m. Galvan went to the grocery store across the street, and Mrs. Santillan testified that she could see him from where she sat on the porch. She saw one girl named Jamie and another girl named Dolores Garcia talking with Galvan in front of the store. Galvan stayed there for about one-half hour after the store closed at 10 p.m. He then returned to Mrs. Santillan's porch.

Jamie Ruiz testified that she saw Galvan and her friend Dolores Garcia at Juanita's Supermarket on July 21, 1977, from 9:30 to 10:15 p.m. She further stated that Dolores took pictures of Galvan in front of the store.

Dolores Garcia testified that at 9:30 p.m. on July 21, 1977, she was at Juanita's Supermarket where she took pictures of her friend Galvan. She left approximately at 10:15 and Galvan was still there.

Defendants Galvan and Calderon were both convicted of murder and sentenced to the State penitentiary. Both defendants appeal their convictions.

Defendant Calderon initially contends that the police did not have

probable cause to arrest him. Further, he argues that the identification which occurred at St. Anthony's Hospital should have been suppressed because it was the fruit of an illegal arrest. The State maintains that based on the totality of the circumstances, the police did have probable cause to arrest Morris Calderon.

■■ To determine whether a police officer has probable cause to arrest an individual, it must be shown that "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the * * * [individual] had committed or was committing an offense." (*Beck v. Ohio* (1964), 379 U.S. 89, 91, 19 L. Ed. 2d 142, 85 S. Ct. 223.) Mere suspicion on the part of the officers does not satisfy the requirement of probable cause for an arrest (*Henry v. United States* (1959), 361 U.S. 98, 104, 4 L. Ed. 2d 134, 80 S. Ct. 168; *People v. Harshbarger* (1974), 24 Ill. App. 3d 335, 321 N.E.2d 138), and the fact that an individual is in the presence of other suspects is not sufficient to constitute probable cause. (*People v. Carnivale* (1975), 61 Ill. 2d 57, 329 N.E.2d 193; *People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474.) However, once a trial court has denied a motion to quash an arrest for lack of probable cause, a reviewing court should not disturb that court's ruling unless it is manifestly erroneous. (*People v. Philson* (1979), 71 Ill. App. 3d 513, 389 N.E.2d 1223.) Additionally, small discrepancies concerning details of a description given to police will not affect a finding of probable cause since this determination must be made based on the totality of the facts and circumstances known to the officers at the time of the arrest. *People v. Schott* (1976), 39 Ill. App. 3d 266, 350 N.E.2d 49, *cert. denied* (1977), 429 U.S. 1097, 51 L. Ed. 2d 544, 97 S. Ct. 1115.

■■ In the instant case the police received a "flash" message over their police radio that a suspect named Vince Galvan was sought in connection with a shooting. The officers were also informed that a blue late model Mustang was involved in the incident. Although the officers were not informed of the identity of any offender other than Galvan, they were given a description of the automobile involved in the shooting. Defendant Calderon was stopped by the officers shortly after the incident driving the "getaway" car. Also, the passenger in his automobile was in fact the specific suspect whom the officer had been alerted was wanted in connection with the incident. Based on the totality of the circumstances presented, we believe that the officers had probable cause to arrest both defendants Galvan and Calderon.

Since we hold that the arrest of Calderon was legal, it follows that his subsequent identification at St. Anthony's Hospital was not tainted with any illegality. Therefore we need not address defendant's reliance on the

case of *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, and its progeny since those cases pertain to identifications subsequent to illegal arrests.

Defendants Calderon and Galvan both maintain that they were not proved guilty of murder beyond a reasonable doubt. The State argues that three eyewitnesses testified that defendants were the perpetrators of the crime and that this evidence was sufficient to convict them of murder.

■■ Defendant Galvan argues that the witnesses Limes, Olvera and Valera were so biased, and their identification of defendant Galvan was so tenuous, as to raise a reasonable doubt concerning his guilt. Significantly, Galvan presents no authority on this point but attempts to reargue the facts which were presented to the jury. Resolutions of conflict in testimony are the peculiar prerogative of the trier of fact, and a reviewing court should not substitute its judgment for that of the trier of fact unless the evidence presented is so improbable that it raises a reasonable doubt of the defendant's guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) A judgment may only be sustained by credible evidence which proves guilt beyond a reasonable doubt, but the determination of the witness' credibility and the weight to be given it are matters which are determined by the trier of fact and should not be disturbed by a reviewing court unless plainly erroneous. (*People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982; *People v. Ashford* (1974), 17 Ill. App. 3d 592, 308 N.E.2d 271; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Since Galvan raises no specific objections but merely attempts to relitigate the facts presented in the lower court, this court should not reverse his conviction because of the alleged bias of the witnesses. As stated in *Ashford*: "The suspicions, contentions and suggestions of the defendant furnish no sound basis for disagreement with the trial court's assessment of credibility." (17 Ill. App. 3d 592, 596.) Since even one witness would be sufficient to convict (*Yarbrough*), the testimony of three witnesses whose credibility has been determined by the jury is sufficient to sustain Galvan's conviction.

■■ Defendant Calderon also alleges that he was not proved guilty of murder beyond a reasonable doubt and presents various contentions in support of this allegation. Initially Calderon maintains that since Limes, Olvera and Valera failed to inform the police of his identity until he was seen by them at St. Anthony's Hospital, there was a serious doubt regarding Calderon's guilt. A witness' failure to disclose facts which, if true, would likely be disclosed by him, may be used to discredit his testimony. (*Fabian*, 42 Ill. App. 3d 934, 938.) If the three witnesses did *not* give a description of Calderon to officer Flores, as Flores testified,

then this failure would certainly bear on the weight and credibility of their later identifications. However, at trial Limes and Valera indicated that they did give a description of Calderon to officers at the hospital. This conflicting testimony was resolved by the trier of fact and should not be reversed by this court.

Calderon also argues that the description of him was too vague to sustain a conviction. Although he was known to the witnesses before the crime, the only description of Galvan was that he was wearing a "Latin Kings" sweater. In *People v. Reed* (1968), 103 Ill. App. 2d 342, 243 N.E.2d 628, the conviction was reversed where the apprehension of the assailant was principally because of a description based solely on defendant's wearing a dark coat. In *People v. Moore* (1972), 6 Ill. App. 3d 932, 287 N.E.2d 130, a conviction was reversed when the court held that when the rapist was described as being black and wearing a white "t-shirt," khaki pants and white gym shoes, the basis of the identification was insufficient to sustain a conviction. However, in those cases the witnesses did not claim to know defendant prior to commission of the crime. Although there may be doubt as to whether the witnesses actually described Calderon ("Moe") to the police prior to their identification of him in the squad car, it was for the judge to determine the resolution of any conflicting testimony.

Finally, defendant Galvan maintains that the prosecutor committed reversible error when he allegedly vouched for the credibility of the State's witnesses during his closing argument. The State maintains that Galvan has not preserved this issue for purposes of appeal or in the alternative that the prosecutor's comment was invited by defense counsel's closing argument.

■■ The pertinent portions of the prosecutor's argument were not objected to by the defense. This failure to alert the trial court to possible prejudicial error waives the issue as a ground for appeal. (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Donald* (1977), 56 Ill. App. 3d 538, 371 N.E.2d 1101.) Consequently it is our opinion that Galvan has not preserved this issue for review by this court.

Even assuming *arguendo* that the issue has been properly presented to this court for review, it does not appear that the prosecutor's comment exceeded proper boundaries. Defense counsel made the following statements to the jury:

"Mr. Laird and Mr. Carey, distinguished State's attorneys, have told you and will tell you again what they think happened * * *.
Well, you know from listening from the evidence and I know, too, they were not there. Neither were the police at the time of the

shooting. Nor was the Judge nor were Ms. Eckert, nor I or Vincent Galvan.

How do the State's Attorneys and the police know what happened? They only know what they were told and who told them. Who told them? The same three gentlemen that you heard sitting right up there * * *. They were contemptuous of the Judge and of you and of me and Vincent and of the system that brought us in this courtroom. *They were liars then and now."* (Emphasis added.)

In response, the prosecutor stated the following:

"Throughout this trial the Defense Attorneys * * * have said the People, the prosecution would be unable to prove that this is a rival gang and a made up story, a conspiracy * * *. It's not a conspiracy. * * * If it was conspiracy then I would become part of it and somehow I have molded the testimony and the identification of Galvan and the three witnesses, and the police lied * * *."

Defendant Galvan maintains that the prosecutor vouched for the credibility of three witnesses which amounted to unsworn testimony by the prosecutor. The State asserts that the prosecutor's comments were replies invited by the defense attorney's accusation of a conspiracy. Galvan correctly asserts that the defense's argument clearly related to a conspiracy, if at all, only on the part of the witnesses and did not include the State or police officers in the accusation. Consequently, the State's reliance upon the cases of *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382, *People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581, and *People v. Mays* (1979), 74 Ill. App. 3d 145, 392 N.E.2d 106, are less than persuasive since they reflect the State's response to comments made by defense counsel. Defense counsel's statements did not invite the reply made by the prosecutor in this case. Therefore, we must determine whether the comments themselves were so prejudicial as to deny Galvan a fair trial.

■■ It is reversible error for a prosecutor to offer his professional opinion regarding the veracity of witnesses' testimony. (*People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.) In *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931, the court held that the defendant was denied a fair trial where the prosecutor informed the jury that in order to believe the testimony of defense witnesses, they would be required to find that each of the witnesses presented by the State was lying. The court held that this was such a grave misstatement of the law that the defendant was unable to receive a fair trial. The prosecutor's comments in the instant case, however, were not of this magnitude. It does appear that the prosecutor attempted to "vouch" for the credibility of the witnesses testifying for the

State; but, contrary to Galvan's assertions, the evidence presented at his trial was not evenly balanced. Three eyewitnesses testified that they had seen Galvan at the scene and identified him as the "shooter." Therefore, even if the prosecutor's remarks were improper, they did not prejudice defendant to an extent which would warrant a reversal. The defense must show substantial prejudice and that the comments were a material factor in determining a guilty verdict. (*People v. Smith* (1972), 6 Ill. App. 3d 259, 285 N.E.2d 460.) The instant case is similar to *People v. Moss* (1977), 54 Ill. App. 3d 769, 777, 370 N.E.2d 89, where it was stated:

> "A review of the record in its entirety fails to establish that the jury's verdict would have been otherwise had the argument complained of remained unsaid."

For the foregoing reasons, we affirm the convictions of both defendants Galvan and Calderon.

Affirmed.

STAMOS and HARTMAN, JJ., concur.