(No. 62357.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM CABRERA, Appellant.

*Opinion filed April 16, 1987.—Rehearing denied June 5, 1987.*

GOLDENHERSH, J., took no part.
CLARK, C.J., specially concurring.
SIMON, J., dissenting.

Steven Clark, Deputy Defender, and Michael J. Pelletier, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chi-

cago, and Joan S. Cherry and Richard A. Stevens, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, William Cabrera, was found guilty of murder, robbery and burglary by a jury in the circuit court of Cook County (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 18—1, 19—1) and was sentenced to a term of 60 years for murder and to extended-term concurrent sentences of 14 years for burglary and robbery. The appellate court affirmed the convictions but reduced the defendant's sentence for burglary and robbery to seven years. (134 Ill. App. 3d 526.) We granted the defendant's petition for leave to appeal (103 Ill. 2d R. 315).

On this appeal the defendant claims (1) the trial court erred in finding that the police had probable cause to arrest him; (2) he was denied the right to be tried by a fair and impartial jury; (3) the State failed to prove him guilty of burglary beyond a reasonable doubt; and (4) the trial court abused discretion in imposing a 60-year extended-term sentence.

On February 12, 1981, Yoel A. Keena, a 74-year-old man, was found dead in a back room of the Assyrian National Foundation (the Foundation) at 1475 West Balmoral Street in Chicago, where he had been temporarily living. Investigating Detective Thomas Sappanos found that entry had been made through a broken window in the office of the foundation and that the premises had been ransacked and a cash box broken into. Sappanos also discovered a receipt for Thomas Cook traveler's checks with the name of the victim; however, no checks were found. The next day, February 13, Sappanos spoke with Dr. Shaku Teas concerning the results of the autopsy she performed on the victim and was informed that the cause of death was "[s]trangulation and subdural hemmorrhage [, bleeding underneath the fibrous

membrane forming the outermost layer covering of the brain,] due to blunt trauma."

Learning that some of the victim's traveler's checks had been used to make purchases of clothing, Detectives Sappanos and Thomas Keane, on February 20, went to the "Different Circle" store in the Century Mall in Chicago. There they questioned Derrick Moore, assistant sales manager, about the purchase made with the stolen checks. Moore informed them that three men came to the store at about 8 p.m. on February 11; he assisted two of the men while they browsed through the store, and a saleslady assisted the third man (whom Moore later identified on April 7, as Ruben Lopez) in the purchase of a red jacket, a white shirt with a Popeye logo, and a necktie. The purchase was made with a Thomas Cook traveler's check, and an identification card bearing Lopez' picture was used. The three men remained in the store for about 20 or 30 minutes. Moore watched as they went into the "Saturday's Generation," a store across from the "Different Circle." Shortly thereafter, Moore observed the three men leaving that store carrying two shopping bags, one with the name "Different Circle," the other with "Saturday's Generation."

On February 23 Moore, after looking through approximately 200 police photographs or "mug shots" at the Chicago Area 6 police station, identified a photograph of the defendant as a picture of one of the men present in the store at the cashing of the check. Moore also told the detectives that the defendant had "a large scar going from his ear down in a diagonal line towards his neck" which was not shown in the photograph. That evening, Sappanos and Keane went to the defendant's apartment at 5523 North Kenmore in Chicago, but he was not there.

The next day at about 5:30 p.m., Sappanos received a telephone call at the police station from a clerk-recep-

tionist at the defendant's apartment house, informing him that the defendant had just returned. Sappanos and Keane, without an arrest or search warrant, immediately went to the defendant's apartment, knocked at his door and identified themselves. The defendant, wearing only gym shorts and looking as though he had just taken a bath or a shower, opened the door. When he did, the detectives observed the scar on his neck and informed him that he was under arrest. They gave him the *Miranda* rights and told him that they "were investigating a homicide, [and] the fact that he had been identified as a person being involved in cashing the [traveler's] checks from the homicide." Upon the defendant's consenting, the detectives made a cursory search of the apartment; nothing was taken. The defendant later claimed that the officers unlawfully entered his apartment, came into his bathroom while he was taking a bath, and told him he was under arrest for murder and burglary. While he was dressing, the detectives searched his apartment without his consent, taking three photos of his girlfriend, the title to his car, his driver's license, and his social security card. The detectives denied these allegations.

The defendant was then taken to the Area 6 police station, where, at approximately 6:30 p.m., he was placed in an interview room. In the room, Detective Keane again informed the defendant of his *Miranda* rights. Sappanos then questioned the defendant about the stolen traveler's checks and the murder, but the defendant denied knowledge of either incident. The detectives then left the defendant in the interview room, returning at approximately 9 p.m. with a sandwich and drink for the defendant. Shortly thereafter, Detectives Sappanos, Keane and Chris Grogman asked the defendant to sign a consent form to search his apartment. The defendant signed the form and remained in the interview room. During the search of his apartment, the detectives

did not find anything related to the murder or cashing of the traveler's checks.

At about 5 p.m. on February 25, Sappanos and Keane entered the interview room to question the defendant, and again prior to questioning, he was given his *Miranda* rights. The defendant told the detectives that he had not been truthful about the check-cashing situation. At first, the defendant told the detectives that Lopez had approached him with the checks, saying that he "had found the traveler's checks in the alley." The defendant then changed his story and said that Lopez informed him that he had obtained the checks by "ripping off a place" next to a dog-grooming parlor, which, as Sappanos testified, was next door to the Foundation. Lopez and he then went to the shopping mall "and cashed the checks." Subsequent to the questioning, Detectives Sappanos, Keane and Grogman left the station with the defendant, as he agreed to show them where Lopez lived.

Arriving at the 1400 block of West Summerdale in Chicago, Sappanos and Keane left the squad car to locate Lopez' apartment, while Grogman remained with the defendant. Upon finding the apartment, Sappanos and Keane obtained, from Lopez' mother and sister, a signed consent to search the apartment. Sappanos found a white shirt with a Popeye logo and took it to the squad car where the defendant identified it as one of the items purchased with the stolen traveler's checks. Grogman took the defendant back to the police station, then returned to Lopez' apartment to continue the search. He found an identification card, to which a picture of Lopez had been affixed, that was later identified by Derrick Moore as the card used by Lopez in cashing the traveler's checks. Sappanos, Keane and Grogman went back to the station, and two other detectives completed the

search. They found the red jacket that had been purchased at the "Different Circle" store.

Early on February 26, after providing the defendant with a sandwich and soda, Sappanos and Keane gave the defendant his *Miranda* rights another time. Again the defendant told the detectives that he had not been totally truthful about the homicide incident. He told them that on the night before the checks were cashed he and Lopez had entered the Foundation by going through a broken window in the office. Once inside, Lopez told him to "search in the front" of the Foundation. There, he found a metal cash box, pried it open, and took $40 which was in the box. The defendant said that, while he was in the front office, Lopez went to the back of the Foundation where he found the victim, who had been awakened by the intrusion. The defendant saw Lopez strike the victim twice; however, the weapon was not described. (The autopsy referred to "strangulation" and "blunt trauma.") The defendant then went to the back room and searched the victim's pockets, where he found the victim's traveler's checks. He and Lopez then left the premises, Lopez taking the traveler's checks from the defendant, and the defendant keeping the $40. The defendant stated that on the following day Lopez told him that he was going to cash the traveler's checks and that if he, the defendant, would come along, he would buy something for him (the defendant). The defendant said he agreed and then gave Lopez $20 of the $40 dollars taken from the cash box. The defendant stated that several items of clothing were purchased with the checks, including a red jacket.

After the defendant's statement to them, the detectives called in an assistant State's Attorney to take the confession. Before taking the confession, the assistant State's Attorney gave the defendant the *Miranda* rights, which the defendant indicated he understood. In

his confession the defendant repeated what he had told Detectives Sappanos and Keane. However, he added that Lopez, using the stolen checks, bought him a pair of yellow corduroy pants and a pair of purple and black dress pants that he had pointed out to Lopez in the "Different Circle" store. (Apparently the defendant erred in this, as the record indicates that the pants were purchased from the "Saturday's Generation" store.) Later that morning, the defendant signed his confession, initialed each of its pages and corrected an error in the transcription of it. A few hours later, the defendant signed another consent form, agreeing to a second search of his apartment. That search produced, as Sappanos testified, the two pairs of pants Lopez had bought for the defendant.

The defendant does not contest the trial court's determination that there were exigent circumstances at the time of his arrest so as to justify the warrantless arrest. Nor does he challenge the finding of voluntariness of his confession, and he acknowledges that numerous times he was given his rights under *Miranda*.

The defendant first argues that the trial court erred in denying the motion to quash his arrest for lack of probable cause. Citing *People v. Creach* (1980), 79 Ill. 2d 96, and *People v. Carnivale* (1975), 61 Ill. 2d 57, the defendant says that the question is whether probable cause to arrest him arose merely because he was in the presence of a person who had used stolen traveler's checks in making a purchase, and for whom the police had probable cause to arrest. He says there was no probable cause to arrest and that all statements and physical evidence obtained by exploitation of his illegal arrest must be suppressed. Too, the defendant notes that the trial court's statement that the defendant was "the person that passed the traveler's check belonging to the deceased," is in direct contradiction to Derrick Moore's trial testimony that the defendant was not the person

who made the purchase with the victim's traveler's check. The State, citing *People v. Pickett* (1973), 54 Ill. 2d 280, argues that the defendant has waived the issue of probable cause by failing to raise it at trial or in his post-trial motion for a new trial. We consider, however, that the record adequately shows that the defendant preserved, for review, the issue of probable cause. We need not address the defendant's argument that the trial court erred in stating that the defendant made the purchase with the victim's check, for there was probable cause to arrest on wholly independent grounds.

"Probable cause exists in the objective sense if ' "*** the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." ' [Citations.] This standard requires more than mere suspicion, but it does not require the arresting officers to have in their hands evidence sufficient to convict the defendant. The courts, in striking a balance between the need to protect citizens from invasions of their privacy at the whim of police officers and the countervailing need to allow leeway for efficient enforcement of the laws, are sensitive to the fact that policemen must often make their decisions to arrest or not to arrest under ambiguous circumstances and must exercise their judgment, at the risk of making a mistake. 'In dealing with probable cause, *** as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citation.]" *People v. Moody* (1983), 94 Ill. 2d 1, 7-8.

In reviewing a trial court's denial of a defendant's motion to quash an arrest for lack of probable cause, this court will not disturb a trial court's finding of probable cause to arrest unless that finding was manifestly er-

roneous. *People v. Clay* (1973), 55 Ill. 2d 501, 505; *People v. Summers* (1981), 100 Ill. App. 3d 170, 175; *People v. Calderon* (1980), 85 Ill. App. 3d 1030, 1036.

The defendant seriously misstates the issue when he says it is simply whether the defendant's being with a person who purchased merchandise with a stolen traveler's check gave probable cause to arrest. It seems clear that the police had other significant information from which probable cause to arrest was reasonably inferred.

Derrick Moore, from the "Different Circle" store, looked through approximately 200 police photographs before identifying a photograph of the defendant as one of the men who was present at the time the purchase was made with the stolen traveler's check. Too, Moore told the detectives that the defendant had a large scar on his neck; a scar that was not visible in the photograph. At trial prior to identifying the defendant's picture, Moore testified that, after speaking with the investigating officers, he had gone to a police station and "looked through pictures, mug shots." The defendant's attorney moved for a mistrial on the ground that the reference to "mug shots" was prejudicial. The motion was denied. Later when the prosecution was moving for the admission of various exhibits, including the police photograph of the defendant that Moore had picked out, Mr. Lyster, the defendant's attorney, objected to the photograph's admission. The record reads:

> "MR. RAAB [Prosecutor]: People's Exhibit Number 43 for identification, having been identified as a colored photograph of the defendant, William Cabrera, being identified by Derrick Moore at Area 6 Violent Crimes vicinity on the 23rd of February, 1981; and also having been identified by Detective Thomas Sappanos as the photograph that was in fact identified by Derrick Moore on that day and at that place.
>
> MR. LYSTER: Your Honor, I will object to that. *That is the mug shot. Of course, it has his breastplate in front*

*of him, indicating his RIWR number on January 21, 1980.*

I think, obviously, it would be prejudicial for it to be admitted, even if it is altered or modified, or clipped, because you would further focus attention on the bottom photo by even covering it. In other words, if we covered the bottom of it with any kind of piece of paper. Obviously, you don't have to be—you know, all you have to do is be a Sam Spade to know what this photo is." (Emphasis added.)

The trial court, after telling the prosecutor, who was arguing for admission of the photograph, that the jury would be shown whatever exhibits were admitted in evidence, denied its admission. Thus, the officers had a Chicago police department mug shot of the defendant with an identification board, and as his attorney complained, the mug shot indicated his Chicago police department identification number and referred to January 21, 1980.

Detective Thomas Sappanos and Thomas Keane were the principal officers in the murder investigation, but at least two other officers were assigned to the investigation, Sappanos testified. Sappanos testified, too, that he prepared about four investigative reports prior to the defendant's arrest on February 24 and that he made a specific report on the identification of the defendant before he and Keane arrested him at 5523 North Kenmore Avenue in Chicago. It is apparent that the police, from the defendant's mug shot with his name and the police identification number, were able to examine the Chicago police department reports regarding the defendant and could ascertain his record and address. Thus, they were able to arrest him at his apartment at 5523 North Kenmore Avenue in Chicago. As stated, Detective Sappanos testified that he prepared a report on the identification of the defendant before his arrest. He certainly would have examined the Chicago police department records of the defendant.

At the time of the defendant's arrest, it must be reasonably concluded that the detectives had knowledge of the defendant's entering and leaving the store with Lopez, the man who cashed the murder victim's check; that his Chicago police department mug shot, with his police identification number, had been identified by Moore; and that from the mug shot they ascertained the information appearing in the Chicago police department records regarding the defendant.

That information included a record of the defendant's convictions for burglary and attempted burglary. At the hearing on the defendant's motion to quash arrest and suppress evidence the State introduced copies of these convictions for burglary and attempted burglary.

Other information in the police department records which was available through the defendant's so-called "rap sheet" or criminal record appears in the record before us in the presentence investigation report. It discloses other burglary arrests, including one on January 21, 1980, which date the defendant's attorney said appeared on the defendant's mug shot together with his police department identification number.

We cannot say that the trial court's finding of probable cause was manifestly erroneous.

Secondly, the defendant contends that he was denied the right to be tried by a fair and impartial jury because, during the polling of the jurors, the trial court did not question a juror, Ms. Ciancanelli, when she asked whether she had to answer yes or no to the court's question whether the verdict of guilty was her verdict.

After the jury announced its verdict finding the defendant guilty of murder, burglary and robbery, the trial court, at the defendant's request, polled the jurors. The court questioned juror Ciancanelli:

"THE COURT: Was this and is this now your verdict, Miss Cancanelli [*sic*]?

MS. CANCANELLI [*sic*]: Can I say what I have to say, or do I have to give a yes, or no answer?

THE COURT: I want a yes or no answer. Was this and is this now your verdict?

MS. CANCANELLI [*sic*]: I found in my own person mind—

THE COURT: I said I want a yes or no answer. Was this and is this now your verdict?

MS. CANCANELLI [*sic*]: Yes."

Upon completion of the polling, the defendant asked the court to inquire of Ms. Ciancanelli, saying it was "obvious she wanted to say more than a yes or no answer." The trial court denied the defendant's request, agreeing with the State that it is not the duty of the court to delve into the jurors' decision-making process, and that the court had given the jurors sufficient opportunity to state whether they were in agreement or disagreement with the jury's verdict.

The defendant later moved for a mistrial on the ground that the trial court erred in not allowing Ms. Ciancanelli to explain her verdict. The defendant argued that a sworn statement of Ms. Ciancanelli, taken shortly after dismissal of the jury, indicated a recantation of her verdict as to the murder charge, and that the court should declare a mistrial. In denying the defendant's motion, the trial court said that it had reviewed the record of the polling of Ms. Ciancanelli and her statement, and as she had stated when questioned that the verdict of guilty was her verdict, a statement made by her after the jury had been discharged would not be considered.

> "I think the record is clear, and I would, without a moment's hesitation, declare a mistrial if I thought that that juror wanted to recant her verdict when she was in the jury box. But once judgement [*sic*] is entered, and I did not have the impression she wanted to recant her verdict, I was very careful not to do anything to influence her one way or the other." (Emphasis added.)

" 'The polling of a jury is intended "to ascertain whether any juror had been coerced into agreeing upon a verdict—coerced by his associate jurors." [Citation.] While polling the jury, a trial court must be careful not to hinder a juror's expression of dissent.' [Citation.]" (*People v. Williams* (1983), 97 Ill. 2d 252, 307.) The trial judge, in determining whether a juror has freely assented to the verdict, not only hears the juror's response, but observes the juror's demeanor and tone of voice during the course of the polling of the jury. (*People v. Kellogg* (1979), 77 Ill. 2d 524, 529; *People v. Herron* (1975), 30 Ill. App. 3d 788, 792.) A trial court's determination as to a juror's voluntariness of his assent to the verdict will not be set aside unless the trial court's conclusion is clearly unreasonable. *People v. Herron* (1975), 30 Ill. App. 3d 788, 792. See also *People v. Hill* (1973), 14 Ill. App. 3d 20; *People v. Riddle* (1977), 49 Ill. App. 3d 46; *People v. Gardner* (1976), 40 Ill. App. 3d 700.

It cannot be said that the determination of the trial judge here that the juror voluntarily assented to the verdict and did not wish to repudiate it is clearly unreasonable. When Ms. Ciancanelli understood that she was to respond with a yes or no answer, she unequivocally answered yes when the judge inquired: "Was this and is this now your verdict?" The situations in *People v. Kellogg* (1979), 77 Ill. 2d 524, and *People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, which decisions the defendant cites, clearly are distinguishable. In *Kellogg* the juror inquired of the court as to whether she might change her vote, and in *Harvey* the juror, when asked if the verdict was his, responded: "Well, it wasn't exactly, no."

The defendant also contends that the statement of Ms. Ciancanelli taken after the dismissal of the jury should have been considered by the trial court. We con-

sider, however, that the trial court's conduct was unquestionably correct. It is clear that a statement by a juror, taken after the jury has rendered its verdict, has been polled in open court, and has been discharged, will not be admitted to impeach a juror's verdict. (*People v. Preston* (1979), 76 Ill. 2d 274, 288-89.) In *Preston* this court stated that *United States v. Schroeder* (8th Cir. 1970), 433 F.2d 846, *cert. denied* (1971), 401 U.S. 943, 28 L. Ed. 2d 224, 91 S. Ct. 951, was pertinent, and said:

> "There a juror signed an affidavit stating that he did not believe that the defendant was guilty and had voted for conviction against his will, although the juror had answered in the affirmative when polled on his guilty verdict. A claim that the verdict against the defendant was not unanimous was rejected by the court. It stated:
>
> > 'After a jury has given its verdict, has been polled in open court and has been discharged, an individual juror's change of mind or claim that he was mistaken or unwilling in his assent to the verdict comes too late. Under the circumstances of this case, the verdict must stand unimpeached.' (433 F.2d 846, 851.)"
>
> (*People v. Preston* (1979), 76 Ill. 2d 274, 288-89.)

Even if we were to consider Ms. Ciancanelli's statement, our review indicates that there is no showing in that statement that, at the time Ms. Ciancanelli was polled, she wanted to change her verdict. Rather her statement indicated that it was not until after the jury had been dismissed that she indicated she wanted to recant her verdict. Therefore, consideration of her statement would not change our conclusion that the defendant was convicted by a unanimous jury.

The defendant contends too that the State failed to prove beyond a reasonable doubt that he committed the offense of burglary by entering, without authority, the Foundation with the intent to commit robbery.

Section 19—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 19—1(a)) provides in part:

> "A person commits burglary when without authority he knowingly enters \*\*\* a building \*\*\* with the intent to commit therein a felony or theft."

Here the defendant was charged with the commission of the offense of burglary "in that he, without authority, knowingly entered into a building, to wit: the dwelling of Yoel Keena with the intent to commit the offense of robbery, therein." Section 18—1(a) of the Criminal Code (Ill. Rev. Stat. 1981, ch. 38, par. 18—1(a)) provides:

> "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force."

To commit burglary there must be an unlawful entry into a building with the intent to commit a felony or theft. (*People v. Peck* (1963), 29 Ill. 2d 480, 484; *People v. Scott* (1969), 43 Ill. 2d 135, 144.) "The felonious intent of an accused may be inferred from his words, action, violence and other conduct and it is within the province of the jury to consider all the facts and circumstances of the case in determining the question of intent." (*People v. Maffioli* (1950), 406 Ill. 315, 320; *People v. Soznowski* (1961), 22 Ill. 2d 540, 543.) Circumstances include "the time, place and manner of entry into the premises, the defendant's activity within the premises, and any alternative explanations offered for his presence." *People v. Richardson* (1984), 104 Ill. 2d 8, 13.

Contentions similar to those of the defendant were made in *People v. Zuniga* (1981), 99 Ill. App. 3d 396. There the defendant, in the early evening hours, entered a church basement through a broken window. A priest, noticing the broken window, entered the church and went to the basement. The defendant struck the priest with a metal rod and demanded his money. The priest managed to elude the defendant and call for help.

On appeal, the defendant in *Zuniga* argued that his burglary conviction should be reversed as the State

failed to prove that he had entered the church with the intent to commit armed robbery. The court stated that the offense of burglary was complete upon the defendant's entry into a building with the requisite intent; and that the elements of the offense, including the defendant's intent, could be inferred from the facts and circumstances in evidence. (*People v. Zuniga* (1981), 99 Ill. App. 3d 396, 400.) The court, in affirming the defendant's conviction, held that the testimony presented was sufficient to create a question for the jury and that the evidence "was not so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt." *People v. Zuniga* (1981), 99 Ill. App. 3d 396, 400.

The evidence here resembles what occurred in *People v. Zuniga*. As stated above, it was the province of the jury to determine the question of intent, and that determination will not be disturbed on review unless the evidence is so improbable as to cast reasonable doubt on the guilt of the defendant. *People v. Stewart* (1984), 105 Ill. 2d 22, 66; *People v. Zuniga* (1981), 99 Ill. App. 3d 396, 400; *People v. Davis* (1977), 54 Ill. App. 3d 517, 524.

The final argument of the defendant is that the trial court abused discretion in imposing an extended-term sentence of 60 years, as the victim's murder was not "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2).

We recently observed in *People v. Barrios* (1986), 114 Ill. 2d 265, 277, that this court has consistently held that " 'where it is claimed that the punishment imposed is excessive, although within the limitations prescribed by the legislature, that sentence should not be disturbed unless it is greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of

section 11 of article II of the [1870] Illinois constitution which requires that all penalties should be proportioned to the nature of the offense. The trial court is normally in a superior position during the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review.' [Citations.]" Unless there has been an abuse of discretion by the trial court, we will not disturb the defendant's sentence. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.

Sections 5—5—3.2(b)(1) and (b)(2) of the Unified Code of Corrections provide:

"[T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:

(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; ***." (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—5—3.2(b)(1), (b)(2).)

An extended-term sentence that may be imposed for murder upon consideration of the statutory factors is a term of not less than 40 years and not more than 80 years. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)(1).

The trial court, in imposing an extended-term sentence here, stated:

"On the murder, I'm finding that the defendant has previously been convicted of [f]elonies and that this particular murder was accompanied by exceptionally brutal or heinous treatment indicative of wanton cruelty. The court specifically recalls the pictures that showed the

blood splattered on the wall, on the floor and I specifically recall the condition of the victim's body, therefore, I'm sentencing the defendant to a term of incarceration with the Illinois Department of Corrections of 60 years *** "

We have reviewed the trial court's sentencing of the defendant; the testimony of Dr. Teas regarding the autopsy of the victim, including the cause of death; the photographs of the victim; and the scene of the crime. On this record it cannot be said that the trial court abused discretion in imposing an extended-term sentence of 60 years for this brutal murder for gain.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.

CHIEF JUSTICE CLARK, specially concurring:

I write separately because I believe that the police illegally arrested the defendant in his home, without first seeking an arrest warrant, and without a showing of exigent circumstances. I concur only because the defendant failed to raise this issue in his briefs to us and to the appellate court, although it was included in his original motion to suppress. 116 Ill. 2d at 485.

Under *Payton v. New York* (1980), 445 U.S. 573, 574-75, 602-03, 63 L. Ed. 2d 639, 643-44, 660-61, 100 S. Ct. 1371, 1374-75, 1388, the police may not, absent exigent circumstances, enter a suspect's home to arrest the suspect without a warrant for his arrest and reason to believe that he is within his home. According to the majority's own account of the facts, the police went to the defendant's apartment, knocked on the door, identified themselves, and then arrested the defendant when he opened the door to them. There is no showing that the

defendant consented to their entry into his apartment prior to his arrest. This was an at-home arrest.

It was not justified by exigent circumstances. An unnecessary and unjustified delay of at least 24 hours elapsed between the time the police supposedly obtained probable cause from Derrick Moore, on February 23, and their arrest of the defendant on the evening of February 24. Under *Payton*, the police need not obtain a search warrant to enter the defendant's residence if they possess an arrest warrant for the defendant and probable cause to believe that the defendant is within the premises. (*United States v. Clifford* (8th Cir. 1981), 664 F.2d 1090, 1093.) Thus the police in this case could have obtained a warrant for the defendant's arrest at any time between obtaining probable cause to arrest on February 23, and arresting the defendant on the evening of February 24. Nothing excuses their failure to do so.

Moreover, it seems clear to me that the defendant's statements and consents were not given of "sufficient free will as to purge the primary taint of the unlawful arrest." (*Brown v. Illinois* (1975), 422 U.S. 590, 600, 45 L. Ed. 2d 416, 425, 95 S. Ct. 2254, 2260.) The length of the defendant's confinement, the lack of food and denial of sleeping accommodations would all tend to suggest that the statements and consents were derived from the exploitation of the defendant's illegal arrest.

In this bicentennial year, it is important to remember that the protections granted all of us under the Bill of Rights would be a dead letter if not enforced by the courts and respected by those charged with enforcing our criminal laws. The prohibitions against unlawful searches and seizures and against coerced self-incrimination are extremely important. They are not meaningless roadblocks thrown in the path of the police. Unless and until this court gives a strong signal that it will not tolerate such illegal activity, the police may continue to ig-

nore the clear letter of the law. The majority's silence with respect to the absence of a warrant in this case does not give such a signal.

JUSTICE SIMON, dissenting:

I dissent because the constitutional requirements for a showing of probable cause have not been satisfied here. Instead, the majority's rationale introduces to Illinois an innovative concept of appellate review. In determining whether there has been a showing of probable cause, reviewing justices may now speculate as to what they would have done had they been the investigating officers, leaving for defendants the task of proving that the real-life police did otherwise. That type of review makes it easier to justify a warrantless arrest than it is to obtain an arrest warrant: for a warrant to issue the State must allege sufficient facts to establish probable cause, while in the case of a warrantless arrest such facts may, under the majority's sanction, merely be presumed. To avoid discouraging the use of arrest warrants, however, the Supreme Court has said that the standards applicable to judging warrantless arrests must be "at least as stringent as the standards applied with respect to the magistrate's assessment." (*Whiteley v. Warden* (1971), 401 U.S. 560, 566, 28 L. Ed. 2d 306, 312, 91 S. Ct. 1031, 1036.) The majority's standard of review is irreconcilable with that admonition.

Disregarding the State's admission during oral argument before this court that "it is not in the record what police officer[s] actually knew at the time [they] arrested the defendant," the majority substitutes as a basis for its decision what the officers might have known. It thus ignores the fundamental rule of warrantless arrests, that the existence of probable cause must be proved by facts within the arresting officers' knowledge at the time the defendant was seized.

"Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." (*Beck v. Ohio* (1964), 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225; see *People v. Wright* (1968), 41 Ill. 2d 170, 174.)

In so doing, the majority rebuffs the previously well-established rule that in cases of warrantless arrest the State carries the burden of establishing probable cause (*People v. Kraman* (1981), 96 Ill. App. 3d 390; *People v. Moncrief* (1971), 131 Ill. App. 2d 770; see *United States v. Allen* (D.C. Cir. 1980), 629 F.2d 51; *United States v. Guana-Sanchez* (7th Cir. 1973), 484 F.2d 590; *State v. Edwards* (1974), 111 Ariz. 357, 529 P.2d 1174; *People v. Tufts* (Colo. 1986), 717 P.2d 485; *Palmigiano v. Mullen* (1977), 119 R.I. 363, 377 A.2d 242; *Roberts v. State* (Tex. Crim. App. 1977), 545 S.W.2d 157), and it requires defendants to produce evidence in the trial court to disprove a theory of probable cause which is only revealed after resolution by the reviewing court.

The defendant claims that there was no probable cause for his arrest because all that the arresting officers knew at the time of his arrest was that the defendant had been in the company of another man who used Mr. Keena's (the victim's) checks to purchase clothing. The trial court found from one of the arresting officer's misleading testimony (that the defendant was "involved" in using the stolen check) that the defendant passed Mr. Keena's check; but Derrick Moore, assistant sales manager at the Different Circle, contradicted that officer's testimony. (The other arresting officer's testimony contained no additional information tending to establish

probable cause.) Moore testified at trial that the defendant came into his store with two other men, and that the defendant browsed through clothing while one of the other two made the purchase at issue. Moore's testimony has been accepted by the State as an accurate account; thus the State now agrees that prior to the defendant's arrest there was no reason to believe that he had made a purchase with, or engaged in a transaction concerning, the victim's check.

According to the majority, however, the defendant mischaracterizes the issue because the police had "other significant information" (116 Ill. 2d at 485-86) tending to establish probable cause. First, the majority finds significance in Moore's identification of the defendant after viewing some 200 photographs and in Moore's description of a scar which the identifying photograph did not depict. True, that information bolsters the certainty of Moore's identification, so the court is able to conclude with greater assurance that the defendant was the man whom Moore observed in his store while somebody else made a purchase with the victim's check. But the defendant has never contested the sufficiency of Moore's identification. Whether the defendant's presence alone provides probable cause is the question presented, a question for which the certainty of Moore's identification is hardly "significant."

The crux of the majority opinion is not what the police could infer from Moore's identification, but what they might make of the identifying photograph. From the existence of defendant's mug shot the majority reaches for a conclusion which the record does not support: that the police were aware of the defendant's earlier burglary convictions. The majority opinion first states—without support in the record—that from the mug shot police could locate defendant's "rap sheet" between the time that Moore identified the defendant's pic-

ture and the time of the defendant's arrest. Next it presumes—also without benefit of evidence—that since police officers could review the defendant's criminal history, they in fact did so. "It is apparent that the police, from the defendant's mug shot \*\*\*, *were able* to examine the Chicago police department reports regarding the defendant and could ascertain his record and address \*\*\* and that from the mug shot [the arresting officers] *ascertained* the information appearing in the Chicago police department records regarding the defendant."' (Emphasis added.) 116 Ill. 2d at 487.

In this manner the majority conjures up additional evidence to support a conclusion which the known facts do not. But the illusion is transparent, particularly as the majority calls upon two equally flawed assumptions to detract from the absence of any supportive evidence.

The first is that police arrested the defendant at the address supplied on his rap sheet, thereby demonstrating that they had read the rap sheet and were familiar with its contents and the defendant's criminal conduct recounted therein. In its brief the State claims: "The last entry on this document [defendant's criminal history] lists defendant's address at 5523 North Kenmore, which is exactly where the police went to arrest defendant." Accepting the State's crude misstatement of the record, the majority reasons: the police were able to ascertain the defendant's address from his record, and "[t]hus, they were able to arrest him at his apartment at 5523 North Kenmore Avenue in Chicago." 116 Ill. 2d at 487.

The flaw in this reasoning is that prior to the defendant's arrest for this crime, his record did not indicate an address on Kenmore Avenue, so the officers' knowledge of defendant's address does not by inference or in any other way establish their knowledge of his burglary record. The defendant's criminal history (appended to this dissent as it appears in the record) indicates for all en-

tries save the last an address of "1230 W. Argyle." The last entry does indicate "5523 N. Kenmore," but what the State's argument and majority opinion have overlooked is that *the last entry was made in connection with the arrest at issue in this case.*

The second assumption is that because one of the arresting officers testified to having written a police report regarding Moore's identification prior to the defendant's arrest, "[h]e *certainly* would have examined the Chicago police department records of the defendant." (Emphasis added.) (116 Ill. 2d at 487.) That presumption is also baseless. The fact that a report was written about the identification proves nothing itself; its relevance to the question of what the arresting officers knew can only be uncovered by knowing what information the report contains. Since the State never offered the report in evidence, an inference arises that its contents are not beneficial to the prosecution. See *Massa v. Department of Registration & Education* (1987), 116 Ill. 2d 376, 386.

By stating that police officers would "certainly" examine the defendant's criminal history, the majority imagines what an experienced detective would investigate and that detectives in this case performed their investigation in accordance with the majority's hypothetical standard. Considering the arresting officer's own lack of precision in testifying as to the defendant's "involvement" in using the victim's traveler's checks, and the extent to which that imprecision has been the cause of this protracted search for probable cause, there is no reason to blindly rely upon the unproved assumption that he took care to examine the defendant's criminal record before making his arrest. More disturbing, however, is the implication that in every future case the court will assume that the actual investigation was a model of good police work, and since unlawful arrests

are inconsistent with good police work, probable cause must exist.

Contrary to the majority's opinion, the record here suggests that prior to the defendant's arrest, the arresting officers knew that the victim had been murdered sometime on the 11th or 12th of February, that one of the victim's traveler's checks had been used on February 11 to purchase merchandise from the Different Circle store in Chicago, that the defendant had been identified as one of two individuals who accompanied a third man to the Different Circle when the third man passed that check, but nothing more. Derrick Moore described those three men to police, but other than the identification of the defendant the record does not indicate what descriptions Moore gave, their depth of detail, or whether the victim matched Moore's description of the man who actually used the traveler's check. Therefore, from what the record shows to have been within the arresting officers' knowledge at the time of the defendant's arrest, the victim himself might have been alive and in the company of the defendant at the Different Circle store, only to be murdered later that night in an unrelated occurrence.

Even stepping beyond the evidence of record to presume that Moore's initial description of the person who negotiated the victim's traveler's check excluded that possibility, all that the arresting officers knew was that the defendant had been in the company of a man for whom probable cause to arrest existed by virtue of his possession of the victim's property. That information was insufficient to justify the defendant's arrest; "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause" for his arrest. (*Ybarra v. Illinois* (1979), 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342; *Sibron v. New York* (1968), 392 U.S. 40, 62-63, 20

L. Ed. 2d 917, 934-35, 88 S. Ct. 1889, 1902-03.) From what the officers knew prior to his arrest, the defendant's conduct was, like that of the appellant in *United States v. Di Re* (1948), 332 U.S. 581, 92 L. Ed. 210, 68 S. Ct. 222, insufficient to justify an arrest because his mere presence while the check was negotiated did not establish his connection to any crime.

> "The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hideout but in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit." 332 U.S. 581, 593, 92 L. Ed. 210, 219-20, 68 S. Ct. 222, 228.

Notwithstanding the majority's attempt to bolster the record with presumptions of good police work, the evidence supports but a single conclusion: that the defendant was arrested solely for having been in the company of another who possessed and used the victim's property. The case is thus similar to *People v. Creach* (1980), 79 Ill. 2d 96, where this court found probable cause lacking for the arrest of Thomas Ruppert. Though he had traveled in the victim's car with Creach to Ohio shortly after the murder, Ruppert's arrest was found to have been made unlawfully, regardless of the legality of Creach's arrest, because "probable cause to arrest a particular individual does not arise merely from the existence of probable cause to arrest another person in the company of that individual." 79 Ill. 2d 96, 102-03; see *People v. Carnivale* (1975), 61 Ill. 2d 57.

The majority appears to distinguish *Creach* on the basis of "other significant information" supposedly known by the arresting officers. Since the record, as I have demonstrated, does not lend support to the majority's rationale, the distinction is invalid, and I do not see how *Creach* can survive the holding in this case. Neither do I believe that the majority opinion is consonant with constitutional safeguards. Moore's identification might have ignited suspicion of the defendant's involvement, but "suspicion is not enough for an officer to lay hands on a citizen." *Henry v. United States* (1959), 361 U.S. 98, 104, 4 L. Ed. 2d 134, 139, 80 S. Ct. 168, 172.

There can be little doubt that "guilt by association" is a fallacious notion which can never legitimate an arrest made without other specific information providing probable cause. (*People v. Fletch* (1971), 174 Colo. 383, 387, 483 P.2d 1335, 1337 (an "arrest based upon the theory that birds of a feather flock together, cannot be sustained"); *Smith v. State* (Okla. Crim. App. 1975), 525 P.2d 1251, 1253.) The majority is in apparent agreement, finding it necessary to draw upon matters not of record to uphold the legality of the defendant's arrest, but the majority never explains whether or why "propinquity" plus supposed knowledge of prior convictions forms probable cause.

The prosecutors were given ample opportunity to offer evidence in the trial court supporting the legality of the defendant's arrest, and misleading testimony by the arresting officers was the best they could produce. That deception revealed, the majority's opinion tries to uphold the arrest by its own sleight of hand. It succeeds, but only to a degree. Although the arrest has been approved, it has not been legitimated.

# APPENDIX to Simon dissent
## in *People v. Cabrera*

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION    Chicago, Illinois  60605

CRIMINAL HISTORY OF: CABRERA, William G.   M/L   15   17
17 W IOO
19 W MOO

DATE: 21 Jan 80
DATE OF BIRTH: 25 May 62

I.R. NO. 570245

FBI NO. 760 069 14    I.S.B. NO.

| NAME & ADDRESS | C.B. | DATE OF ARREST / ARRESTING OFFICER & DIST. / CHARGE | DISPOSITION |
|---|---|---|---|
| William G. CABRERA 1230 W. Argyle | 5732394 | 21 Jan 80, Liedzianowski 20, Burglary. 4 Feb 80, Burglary (38-19-1a) SOL, Judge Reynolds | |
| William G. CABRERA 1230 W. Argyle | 5791652 | 14 Apr.80, Off. Mickey, 20th.Dist. Burglary 18 Apr 80, Att. Burglary (38-8-4a) SOL, Judge Reynolds | |
| William G. CABRERA 1230 W. Argyle | 5803392 | 27 Apr 80, Martinek 20, D/C. 21 May 80, Disord cond (MCC) LEE, Judge Salerno | |
| William CABRERA 1230 W. Argyle 25 May 62 | 5907150 | 22 Aug 80 Off. Negard 020th Dist. Burglary 25 Aug MO Burg(38-19-1) Att Burg(36-8-4) INF#80-18156, INF#18057 PQFG 36 Mos Fel. PROBATION to run concurrent Judge Reynolds | |
| William SANCHEZ 1230 W. Argyle 25 May 62 | 5946710 | 6 Oct 80, Off. Nigro SOG/W (19) Dist. Att. Burgl. 1 year probation Judge Reynolds | |
| William Cabrera 5523 N. Kenmore 25 May 62 | 6051 682 | 26 Feb, 81, Off. Grogman, Area 6 Viol. Crimes (19), Murder 8 Apr 81, INF#81-2442, Murder, Burglary, Robbery. | |

APR 21 1983