377 A.2d 242.

Nicholas A. Palmigiano *vs.* James Mullen, *Warden.*

AUGUST 31, 1977.

Present: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

BEVILACQUA, C.J. On May 30, 1974, the petitioner filed with this court a petition for a writ of habeas corpus challenging the legality of his arrest. After consideration, this court, on September 25, 1974, issued an order denying the petition without prejudice and remanding the petition and papers to Superior Court for an evidentiary hearing. This court further ordered that the petition be treated as if it had been originally filed as an application for post-conviction relief under G.L. 1956 (1969 Reenactment) §10-9.1-1.

In accordance with these instructions, an evidentiary hearing on the petition was held in Superior Court, and the trial justice found that the warrantless arrest of petitioner in

a dwelling house was lawful. Specifically he found that the police had probable cause to arrest petitioner and that they entered the apartment pursuant to the tenant's consent. The plaintiff now appeals from the Superior Court judgment.

In the course of the evidentiary hearing the following facts were adduced. On April 10, 1969, the Providence Police received a call informing them that there had been a holdup of the Brinks armored truck at the H.P. Hood & Sons' plant on Harris Avenue in Providence. When the police arrived on the scene, they learned that the guard carrying the money had been shot by a person wearing a wig and women's shoes. In the process of fleeing, the robber dropped the money and discarded the wig and shoes. It then became evident that the robber was a man disguised as a woman. The robber stole a station wagon belonging to the Brownell & Field Company, located next door to H.P. Hood & Sons.

From the interrogation of several witnesses at the scene of the crime, the police acquired the following information. The witness who saw the robber leave the scene of the crime disguised as a woman and emerge from the alley without the disguise was able to furnish a specific description which included height, build, complexion and hair, and which fit petitioner. Gerald Mastracchio was seen immediately prior to the robbery riding a motorcycle which he drove right in front of the armored car, forcing it to slow down on Dean Street Bridge leading on to Harris Avenue. He was also observed parked in the area of H.P. Hood & Sons during the robbery-murder talking to an unknown person in an automobile; after the shooting he left the area on his motorcycle.

Prior to the holdup, the Providence police, specifically Captain Eddy and then-Lieutenant O'Connell, had received information from one Fred Rylance that he and others had been asked by Gerald Mastracchio to participate in a holdup of the Brink's truck which carried money to H.P. Hood & Sons. In addition, police officer O'Connell testified that on several occasions prior to the holdup, peti-

tioner and Gerald Mastracchio were observed in each other's company.

Immediately after the questioning the witnesses at the scene of the crime, the police sent an order to pick up Gerald Mastracchio for questioning concerning the robbery. In the meantime Lieutenant O'Connell received a call informing him that the stolen station wagon had been found abandoned in the Eagle Park area of Providence, not far from where petitioner lived.

Based on this information, including the description of the robber and the fact that petitioner and Gerald Mastracchio had been observed together, the police began to search the Eagle Park area for petitioner. Shortly thereafter they were told that Gerald Mastracchio had been apprehended. With Mastracchio in their custody, the police officers went to the Vandewater Street home of petitioner but failed to find petitioner. Then Lieutenant O'Connell received a call from Detective Sergeant Thomas Leyden asking to meet him at a certain place. When the lieutenant arrived, Leyden informed him that he had received information from a reliable person that petitioner had been seen entering a house located at 553 Charles Street, where Mrs. Salvatore, petitioner's aunt, resided and where on occasion petitioner was known to have also lived. About 5 to 10 officers then gathered at that address and several went up to the rear portion of the third floor where Mrs. Salvatore's apartment was located. The officers knocked at the door and announced themselves.[1] They had not procured an arrest warrant.

At the hearing one of the police officers testified that he and the other officers attempted to take the hinges off the door. No reference to this was made by Mrs. Salvatore in her testimony. She testified that she opened the door

---

[1]The police testified that Gerald Mastracchio accompanied them during their search for the petitioner; in contrast to his attitude at the other homes they searched, he was reluctant to enter the Salvatore home.

because she became frightened when she heard the police talk about breaking the door down with a hatchet. However, this testimony contradicted a signed, sworn statement which she gave to Officer Fuina at 11:00 A.M. on April 10, 1969, the morning of the robbery. In that statement, she said that petitioner had come to her house and told her that he was in "a little trouble." She also stated that after he had arrived, she received a phone call from a sister-in-law who mentioned the Hood robbery and told her that the man from the payroll had been shot. The sister-in-law then said that she hoped that petitioner was not involved. In this same statement Mrs. Salvatore said she gave her consent to the police to search her premises. At the hearing she admitted signing a statement, but claimed that she told the officer that she opened the door because the police had threatened to force their way in by using a hatchet and she was afraid the police would break it.

However, Officer Fuina testified that he wrote down the statement, as it was given to him, and that Mrs. Salvatore read it prior to signing it. He further testified that she made no mention of any hatchet.

Upon entering the apartment, the police observed that petitioner was bleeding from his wrist. One of the Brinks guards had informed the police that he thought he had wounded the robber-murderer. At trial, it was disclosed that blood had been found at the scene of the crime and also in the stolen getaway car.

After his arrest, petitioner was taken into custody and taken to the police station where he was fingerprinted and examined by a doctor. He was also placed in a lineup and identified. All of this evidence was introduced at trial. The petitioner now contends that it should have been suppressed, as the "fruit" of an illegal arrest.

On appeal petitioner contends that the trial justice erred in finding that his arrest was legal. Specifically, he argues that the police did not have probable cause to arrest him,

but that even if they did, his arrest was the fruit of an illegal search: the warrantless entry by police into Mrs. Salvator's apartment to search for petitioner was illegal (1) because it was not voluntarily consented to and (2) because it was not justified by exigent circumstances. In addition, petitioner argues that the trial justice erred in assigning the burden of proof to petitioner to establish the lack of probable cause to arrest and the absence of consent to enter the apartment.

## I

At the outset, the state argues that petitioner lacks standing to challenge the legality of the warrantless entry by police into Mrs. Salvatore's apartment. The trial justice reasoned that a warrantless entry into an apartment to effect an arrest was distinguishable from a warrantless entry to conduct a search for evidence and concluded that petitioner did not have standing.[2] We disagree.

In the landmark case of *Jones* v. *United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), the Supreme Court held that anyone legitimately on the premises has standing to challenge the legality of a search when the fruits of the search are proposed to be used against him.

In determining standing, therefore, we see no reason to distinguish an entry to search from an entry to arrest. It is clear from the record in the instant case that petitioner was present in the home of his aunt, Mrs. Salvatore, with her permission. Since the essence of petitioner's challenge is that the entry into Mrs. Salvatore's apartment was illegal and that the evidence thereby obtained should have been suppressed, we conclude that petitioner has standing to challenge the legality of the warrantless entry by police.

## II

The petitioner contends that the trial justice's finding that Mrs. Salvatore voluntarily consented to the entry by police into her apartment was clearly wrong.

---

[2] He nonetheless considered and decided each of the petitioner's allegations.

One of the established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854, 858 (1973). Thus, a warrantless entry by police into a dwelling house authorized by a valid consent is constitutionally permissible. However, the validity of the consent turns on whether it was freely and voluntarily given. *Bumper* v. *North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 1792, 20 L. Ed. 2d 797, 802 (1968); *State* v. *Sprague,* 114 R.I. 282, 331 A.2d 399 (1975). And the question of whether consent was "in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth* v. *Bustamonte, supra* at 227, 93 S. Ct. at 2047-48, 36 L. Ed. 2d at 862-63.

A review of the record discloses that on April 10, 1969 in the sworn statement she made to Officer Fuina, which was entered as an exhibit, Mrs. Salvatore told him that she gave the police consent to enter her apartment.[3] However, in the hearing below, she stated that the only reason she allowed the police to enter was because she heard them say they were going to chop the door down with a hatchet. The police officers testified that she opened the door and allowed them to enter. The police also testified that they discussed the possibilty of taking the hinges off the door; Mrs. Salvatore, however, made no mention of this in her testimony.

The record also discloses that at the hearing the April 10, 1969 statement was shown to Mrs. Salvatore, and she admitted making the statement. However, she claimed that

---

[3]It is not disputed that the consent to search by Mrs. Salvatore, the legal occupant of the apartment, could be effective against the petitioner in the instant case. See *Frazier* v. *Cupp,* 394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); *Bumper* v. *North Carolina,* 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); *State* v. *Cairo,* 74 R.I. 377, 60 A.2d 841 (1948).

she told Officer Fuina about the hatchet at the time she made the statement. Officer Fuina denied this.

The trial justice specifically discounted Mrs. Salvatore's testimony that she opened the door for the police because she believed that they were going to break it down. He noted that Mrs. Salvatore had been told about the killing by her sister-in-law; that her sister-in-law had expressed a fear that petitioner might have been involved; that when petitioner arrived at his aunt's apartment he was bleeding and he told her he had had "a little trouble"; and that Mrs. Salvatore's children were present in the apartment during this time. On the basis of the evidence before him, the trial justice found, in essence, that Mrs. Salvatore opened the door because she knew the police were looking for her nephew, and she had reason to believe he might have been involved in the robbery. As a result, he determined that "the only reasonable inference which can be drawn from the credible evidence is that she opened the door voluntarily and allowed the police to enter."

Clearly the evidence presented to the trial justice on the issue of consent was conflicting. This court has stated that discrepancies in the testimony of witnesses raise questions of credibility which are left to the determination of the trial justice sitting without a jury. *Gesualdi* v. *Miranda*, 110 R.I. 694, 296 A.2d 676 (1972).[4] In arriving at his decision the trial justice drew inferences and conclusions from the inconsistent and contradictory evidence. It is well settled that the findings of fact of a trial justice sitting without a jury are entitled to great weight and will not be disturbed by this court on appeal unless they are clearly wrong. *Abilheira* v. *Faria*, 102 R.I. 214, 229 A.2d 758 (1967). *See also State* v. *Sprague*, *supra*. The petitioner has failed to persuade us that the trial justice's findings and the inferences which he drew from the

---

[4]General Laws 1956 (1969 Reenactment) §10-9.1-7 provides that "[a]ll rules and statutes applicable in civil proceedings shall apply" in proceedings under the Post Conviction Remedy Act.

evidence are clearly wrong. Consequently we conclude that Mrs. Salvatore voluntarily consented to the entry by police into her apartment, and therefore their entry was lawful.[5]

### III

The petitioner contends that the trial justice erred in finding that the police had probable cause to arrest him.

General Laws 1956 (1969 Reenactment) §12-7-4 provides in pertinent part:

> "A peace officer may without a warrant arrest a person for a felony, whenever:
>   (a) The officer has reasonable ground to believe that a felony has been or is being committed and that the person to be arrested has committed or is committing it."

We have previously stated that the terms "reasonable ground" and "probable cause" in this area of the law have substantially the same meaning. *State* v. *McWeeney*, 100 R.I. 394, 399, 216 A.2d 357, 360 (1966). The necessary inquiry, therefore, is whether there was probable cause to arrest petitioner.

When the constitutional validity of a warrantless arrest is challenged, the test to be applied is whether, at the moment the arrest was made "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck* v. *Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142, 145 (1964); *United States ex rel. Falconer* v. *Pate*, 319 F. Supp. 206, 211 (N.D. Ill. 1970). Although good faith on the part of the arresting officers is not enough, sufficient evidence to

---

[5]Since we conclude that the entry was lawful because of consent, we will not decide whether the exigent circumstances, otherwise necessary to justify entry, were present.

establish guilt is also not necessary to validate a warrantless arrest. *Henry* v. *United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134, 138 (1959). The established rule is that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. *Spinelli* v. *United States*, 393 U.S. 410, 419, 89 S. Ct. 584, 590, 21 L. Ed. 2d 637, 645 (1969), *citing Beck* v. *Ohio, supra* at 96, 85 S. Ct. at 228, 13 L. Ed. 2d at 147.

In the instant case, the trial justice concluded that the police had sufficient knowledge and information to warrant their belief that petitioner was one of the perpetrators of the the robbery-murder. The trial justice specifically found that prior to the crime the police received information from one Ryland that Gerald Mastracchio and others intended to rob the Brinks' truck; that after the robbery a witness gave police a description of one of the robbers that fit petitioner; that Mastracchio and petitioner had been seen riding together on a motorcycle a few days prior to the crime; that a motorcyclist had attempted to delay the Brinks' truck as it approached the scene of the crime; that the motorcyclist had been seen near H.P. Hood & Sons during the commission of the crime and that the stolen station wagon was found abandoned a short time later in the Eagle Park area of Providence, near petitioner's home. Much of this information was either broadcast over the police radio network or was otherwise relayed to the men in the field. We have said that arresting officers are entitled to rely on departmental knowledge which comes to them through official channels. *State* v. *Duffy*, 112 R.I. 276, 308 A.2d 796 (1973). Furthermore, upon entering the apartment with Mrs. Salvatore's consent and before making the arrest, the police, who had been informed that a Brinks' guard believed he had wounded the robber-murderer, observed that petitioner was wounded in the left hand. We conclude that on this record the facts and circumstances within the knowledge of the arresting officers and of which they had

reasonably trustworthy information were sufficient to establish probable cause to believe petitioner had committed the offense.

## IV

The trial justice, in response to petitioner's contention below that the state had the burden of proving consent, noted that §10-9.1-7 of the Post Conviction Remedy Act provides that "[a]ll rules and statutes applicable in civil proceedings shall apply," and consequently concluded that petitioner had the burden of proving each of his allegations. On appeal, petitioner contends that it was error to place the burden of proof on him.

Section 10-9.1-1 specifically states that the remedy provided pursuant to this Act "comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them." Furthermore, as noted by the trial justice, proceedings under this Act are civil in nature. Section 10-9.1-7. As a result, in proceedings under this Act the petitioner generally bears the burden of proving his allegations by a preponderance of the evidence. See ABA Project on Standards for Criminal Justice, *Standards Relating to Post-Conviction Remedies* §4.6(d)(Approved Draft, 1968).

However, as we have previously stated, this Act's substitution of one remedy for another was a change in procedure only, and not in substance. *State* v. *Lanoue*, 117 R.I. 342, 344, 366 A.2d 1158, 1160 (1976). Consequently, the proceedings in this case under the Post Conviction Remedy Act should be substantially the same as if they had been conducted pursuant to a petition for habeas corpus. Although in habeas cases the burden of proof is generally on the petitioner, *LaRoche* v. *Langlois*, 102 R.I. 582, 586, 232 A.2d 365, 367 (1967), the burden of proving consent to a search is on the government, *Bumper* v. *North Carolina, supra* at 548,

88 S. Ct. at 1792, 20 L. Ed. 2d at 802, even in habeas cases. *Leavitt* v. *Howard*, 462 F.2d 992, 995 (1st Cir. 1972). As a result, we conclude that the trial justice erred in holding that petitioner had the burden of disproving consent.

Nonetheless, the trial justice's error in assigning the burden of proof does not require reversal unless it prejudiced the petitioner. *State* v. *Brown*, 96 R.I. 236, 242, 191 A.2d 353, 354 (1963). With regard to the issue of the burden of proof, the trial justice specifically stated in his decision, "[n]ot only did petitioner not sustain his allegations as to a lack of probable cause and Mrs. Salvatore's consent, the State presented *more than ample evidence* that there was probable cause and that voluntary consent to the entry was in fact given by Mrs. Salvatore." (Emphasis added.) It is clear from this statement that even if he had determined that the state bore the burden of proof, he would still have concluded that the consent was voluntary and that the petitioner's arrest was legal. As a result, we conclude that the trial justice's misallocation of the burden of proof did not constitute reversible error.

The petitioner's appeal is denied and dismissed and the judgment appealed from is affirmed.

*William F. Reilly*, Public Defender, *Richard A. Gonnella, Barbara Hurst, John A. MacFadyen III*, Assistant Public Defenders, for petitioner.

*Julius C. Michaelson*, Attorney General, *Judith Romney Wegner*, Special Assistant Attorney General, for respondent.