[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Ann McMaugh has asked the Superior Court to grant her a new trial on the charge that she shot to death Gregory Dube in front of a barroom in Smithfield, Rhode Island, in the early morning hours of August 15, 1980. The salient facts at the trial were these:
Ann McMaugh and Bernard McMaugh lived together as husband and wife beginning in 1973. They were married in 1981. Their daughter Sheila was about 10 years old at the time of trial. The McMaughs, at the time in question, were living in Johnston. Ann McMaugh worked as a cashier and bookkeeper at her father's movie theater, Apple Valley Cinema, in Smithfield, generally working from 6 p.m. to 10 p.m., although she frequently stayed beyond 10 p.m. On the night in question, she was picked up about 11 p.m. by her husband and a friend, Dennis O'Keefe, in O'Keefe's car. They went to Bernard's mother's house to pick up their daughter but when they arrived, Sheila was sleeping and they decided to let her sleep over. They were then driven to their home in Johnston where Ann McMaugh changed her clothes. She and Bernard then left in their own vehicle to go to the Causeway Lounge in Smithfield about 4 or 5 miles from their home.
While there, Ann, who described herself in the pre-sentence report as a "moderate drinker", sat at the bar with her husband Bernard and another friend. After they had been at the bar about an hour, and while Bernard briefly left the bar area, Gregory Dube came over to Ann McMaugh and asked her if she were related to Michael Moran; Ann McMaugh acknowledged that Michael was her brother and she and Dube spoke briefly. When Bernard returned, he quarreled with Dube, and both stepped outside to continue their argument. The argument was loud enough to be heard by Ann inside the bar.
Bernard returned to the lounge and he and his wife left shortly afterwards, with a friend whom they dropped off before going back to their Johnston home.
At home, according to Ann McMaugh's trial testimony, she put her purse on the table, where some of the contents spilled out, went to the bathroom, came out and saw her husband Bernard leaving the house. She gathered up the spilled contents, followed her husband and asked where he was going. He said he was returning to the Causeway to resume a conversation he had been having with an old friend named Joe Foster.
On direct examination, Ann McMaugh said she went with her husband back to the lounge because Bernard had a heart condition and she "didn't want him going anywhere by himself." On direct, she also claimed that the first time she saw the two guns was when she got into the car to return to the lounge and saw them on the console of the front seat.
Again, on cross examination, Ann McMaugh reiterated that the first time she saw the guns was when she got into the car with her husband to return to the Causeway.
The guns were a .41 caliber magnum, fully loaded and a .22 caliber semi automatic pistol. Ann also testified that while in the car, she looked into her pocketbook, found an item she did not recognize, asked her husband what it was, and when he said it was an ammunition case, she put it down on the seat with the guns.
They arrived at the Causeway at about closing, parked their car and waited outside the lounge in their vehicle. Robert Croft, Jr., a friend of the victim Gregory Dube testified that he and Dube left the lounge at about 2:10 a.m. He noticed the McMaugh vehicle parked on the street with Bernard and Ann McMaugh seated inside. Dube, Croft and some other young men went across the street to play cards on the hood or trunk of a car for a few minutes, and then, as they were all leaving, Bernard McMaugh called Dube over to his car. Croft also testified that Dube and Bernard had begun arguing a few days before the shooting, because of Bernard's belief that Dube was trying "to score his wife."
Another witness to the shooting, Jeffrey Mansi, substantiated the Croft testimony, and testified that when Dube approached the McMaugh car, an argument erupted. He heard a shot, saw Dube move a bit, and within a second or two heard a second shot, after which Dube fell to the ground mortally wounded by a bullet from the .22 caliber pistol. The McMaugh vehicle then raced from the scene of the shooting. They were apprehended by the police a short distance away.
Both guns, and most of the ammo case, had been wiped clean of fingerprints. Each gun had been fired once.
Ann McMaugh chose to testify at her trial; her husband did not. Each had separate trial attorneys at their joint trial.
Ann McMaugh's version of the events is as follows. She claimed, as did Bernard in his statement to the police that Dube approached their automobile and threatened Bernard, who fired a shot from the .41 magnum to frighten Dube. Dube then reached into the open driver's window in an effort to grab Bernard or to wrestle the gun from him. Ann also testified that she picked up the .22 caliber gun and while trying to throw the gun into the back seat out of Dube's reach, the gun accidentally discharged, killing Dube. The evidence disclosed that the .22 caliber gun was fired about a foot from Dube's face.
Several firearms experts testified to issues that had previously been disclosed in discovery to petitioner and her co-defendant. A "dead weight" test on the .22 caliber gun from which the fatal bullet was shot revealed that the trigger had a pull requiring 2 1/2 to 3 pounds of pressure, and that in other tests, the .22 caliber pistol could not be accidentally discharged. The weapon could not fire unless the trigger was manually pulled.
Both McMaughs were convicted of first degree murder, conspiracy to commit murder, and carrying a pistol without a license. Bernard was also convicted of assault with a dangerous weapon. Both were sentenced to a mandatory life sentence on the murder conviction. Bernard was sentenced to a consecutive ten year term on the conspiracy charge. Ann's ten year sentence on the conspiracy charge was imposed as a concurrent sentence.
Ann McMaugh appealed her conviction to the Rhode Island Supreme Court. State v. McMaugh, 512 A.2d 824 (1986). There, she conceded that she shot the fatal bullet, 512 A.2d at 830. Her appeal principally addressed the adequacy of the evidence to support a finding that she had a conscious design and intent to kill Dube. Ann McMaugh also claimed that the trial justice erred in not dismissing the case either under then-existing Rule 48(b) of the Superior Court Rules of Criminal Procedure or pursuant to the Sixth Amendment of the United States Constitution. In rejecting her claim of lack of speedy trial, the Supreme Court noted that Ann McMaugh was responsible for part of the delay when she twice changed trial counsel during the pendency of her case.
While her appeal to the Supreme Court was pending, Ann McMaugh filed a petition for post-conviction relief under R.I.G.L. 1956, § 10-9.1-1 et seq. (1985 Reenactment), alleging ineffective assistance of counsel at her trial. That petition was filed by her attorney, not as a separate petition, but within the original case numbered P1/83-203. That petition languished until July 11, 1986, less than two weeks after her Supreme Court appeal was denied, when she filed a separate petition for post-conviction relief also claiming ineffective assistance of counsel. That petition was filemarked as Providence County Miscellaneous Petition 86-2956, the within petition for post-conviction relief. On August 18, 1986 that petition was amended in minor particulars. The primary claim remained ineffective assistance of counsel infringing upon her Fifth Amendment rights. On June 18, 1987, new counsel entered for the petitioner and on August 27, 1987 a Second Amended Application for Post-conviction Relief was filed.
This petition raised a novel issue. Ann McMaugh, while not denying that she shot and killed Gregory Dube, alleged that owing to a long history of physical and mental abuse inflicted upon her by her husband, Bernard McMaugh, she was "psychologically and otherwise incapable of communicating relevant facts regarding her memory of the events surrounding Gregory Dube's death and her state of mind at the time either to the police, to the Court, to the jury or to her lawyer at her trial on Indictment No. P1/83-203."
The claim was thus raised that by virtue of her status as a "battered woman", Ann McMaugh "was unable to assist counsel in her own defense and was therefore deprived of her right to the effective assistance of counsel." Petitioner also included claims of newly discovered evidence of an exculpatory nature, and a claim that her pretrial statements and trial testimony were coerced by her husband and were therefor involuntary and given under duress.
After briefing, and a hearing on the state's motion to dismiss, this Court concluded that there were material issues of fact necessary to a determination of the application for relief and granted a plenary evidentiary hearing.
Ann McMaugh did not testify at the hearing on her petition for post-conviction relief. A number of her former attorneys, including her trial attorney, testified at the hearing, as did her husband's trial attorney. She also presented extensive expert testimony and introduced a number of reports into evidence relating to the so-called "battered woman syndrome".
ISSUES RAISED
Ann McMaugh claims that she was the victim of long-term physical and psychological abuse inflicted upon her by her husband Bernard, abuse that increased in intensity after the shooting death of Gregory Dube, and that lasted at least throughout their joint trial.
Implicit in her pleadings, memoranda and evidence presented at her hearing is the suggestion that Bernard, not she, fired the fatal shot, and that Bernard during the period between shooting and trial, concocted a story he coerced her into presenting to the grand jury and at her trial in order to exonerate him.[1]
Her fallback position is that if she did indeed fire the fatal shot, she was unable, by virtue of her status as a "battered woman", to present facts which might have militated against the existence of premeditation. She suggests that a form of duress defense or even a self defense issue could have been presented at her trial had she had the capacity to communicate her status to her trial attorney. She also claimed that her husband's attorney improperly represented her when she appeared before the grand jury.
Among the issues pressed by the petitioner is whether a person who is defined as fitting within the definition of a "battered woman" is incompetent to stand trial by virtue of that status, whether evidence of such abuse constitutes newly discovered evidence sufficient to warrant a new trial, and whether she was denied her right to a fair trial and to present a defense when that defense was "fixed" by certain pre-trial testimony given by her before the grand jury and to the police which was obtained, according to her, as a result of her husband's coercion. She claims that those coerced statements were involuntary and inadmissible.
Before the taking of testimony at the post-conviction hearing, certain pre-hearing memoranda of the petitioner suggested that among the facts she would prove would be these:
— The petitioner was suffering from the "battered woman syndrome", and was therefore unable to make her own decision as to whether she should testify before the grand jury.
— That grand jury testimony was false, invented by her husband to clear only himself, and she was coerced into telling that false story, a fiction that was readily contradicted by the physical and forensic evidence in the case, leading to her conviction.
— Had she not been the victim of spousal abuse, she would have been able to testify in a manner more consistent with the physical evidence.
— She would have been able to mount a better defense which at worst would have convicted her of a lesser offense than murder.
— Because she was the victim of spousal abuse and may also have experienced a dissociative reaction after the shooting, she was unable to remember what really happened on the night that Dube was shot, and was otherwise incompetent to stand trial.
ALLOCATION OF BURDEN OF PROOF
In deciding the various issues raised by the parties, this Court has applied the rule that with respect to the burden of proof, the proponent of any issue herein was required to establish the facts relating to that issue by a preponderance of the evidence. Palmigiano v. Mullen, 119 R.I. 363, 377 A.2d 242
(1977), State v. Duggan, ___ R.I. ___, 414 A.2d 788 (1980), cf., ABA Standards for Criminal Justice, Post-conviction Remedies, Standard 22-4.6(d).
RHODE ISLAND COMPETENCY TEST
Rhode Island General Laws 1956 (1990 Reenactment) §§40.1-5.3-3(a) (2) and (3) set out the definitions of competency and of incompetency in this state and read as follows:
 40.1-5.3-3. Competency to stand trial. — (a) Definitions as used in this section:
 * * *
 (2) "Competent" or "competency" means mental ability to stand trial. A person is mentally competent to stand trial if he or she is able to understand the character and consequences of the proceedings against him or her and is able properly to assist in his or her defense;
 (3) "Incompetent" or incompetency" means mentally incompetent to stand trial. A person is mentally incompetent to stand trial if he or she is unable to understand the character and consequences of the proceedings against him or her or is unable properly to assist in his or her defense:
 * * *
Rhode Island case law on this point is unambiguous. When competency is in issue, the question is whether or not the accused had the intellectual and emotional capacity to perform the functions which are essential to the fairness and accuracy of a criminal trial, whether the accused was able to understand the nature and consequences of the procedure and the charges against the accused, and whether the accused possessed or lacked sufficient mental competence to consult with counsel with a reasonable degree of rational understanding. State v. Cook,104 R.I. 442, 244 A.2d 833 (1968). Properly assisting in one's defense includes such things as participating in those aspects of a defense as an accused usually assists in, such as recounting events or furnishing names of witnesses.
Nothing in the record of this case is in the least persuasive to this Court on this point. By all accounts, including evidence of the demeanor, behavior and testimony of the petitioner at trial, the petitioner was competent in every respect to stand trial.
According to the representation made by her trial attorney in open court when the case was reached for trial, he had consulted with his client with respect to her request for a severance of her trial from that of her co-defendant husband, and, in his words, ". . . we decided that motion also should be passed. We are not going to pursue that." This act of consultation with the client, a fact specially noted by the Supreme Court in State v.McMaugh, 512 A.2d at 828, speaks directly to the issue of her ability to assist counsel.
The opinions offered by the petitioner's experts on this issue were, plainly speaking, not worthy of any weight. The reasons offered by them in support of their opinions were not sound and were heavily outweighed by other evidence in their own testimony, in her accounts to them and by the evidence adduced at her jury trial, including her behavior at trial.
It is clear from the record that the petitioner had sufficient ability at the time of trial to consult with her lawyer with a reasonable degree of rational understanding. She consulted with him on various motions, and decided with him whether to continue to press those motions or abandon them. No suggestion of any kind was ever raised by her trial attorney, an experienced defense counsel, with respect to her ability to understand the nature of the proceedings. His testimony at the post-conviction hearing on this and other issues is detailed later.
There was no evidence of irrational behavior, no demonstration of any mental or emotional disorder affecting her ability to consult, and no manifested confusion in response either to direct examination by her attorney or to searching and penetrating cross-examination by the prosecutor. She was lucid, articulate and extremely well-oriented to the proceedings at trial.
Nor did her attorney complain at time of trial that she was refusing to consult with him or that she was impaired in any way. She may have made some bad tactical choices, but that alone fails to qualify as evidence of incompetency to stand trial.
Neither the testimony of Dr. Browne or Dr. Kaiser is at all persuasive on this point. Dr. Browne testified that in her opinion, based upon a reasonable degree of scientific certainty, the petitioner was unable adequately or rationally to assist her lawyer either in the preparation of a defense or in the presentation of a defense. Remarkably, Dr. Browne arrived at this conclusion without having attended the trial, without having read the grand jury transcript of Ann McMaugh's testimony, without having read a trial transcript of Ann McMaugh's testimony, and, most startling of all, without having interviewed her trial attorney, William Dimitri. The report of Dr. Kaiser was equally flawed.
Even a cursory review of the day-long testimony of the petitioner at her jury trial is clear evidence that the defendant was, in fact, competent by all criteria used to determine competence. She understood where she was; she knew that she was on trial for murder; she knew the function of the court, the jury, the prosecutor and her own attorney. She was not disoriented or out of touch with reality; she was able to understand the questions put to her by her attorney, and to answer them sensibly and rationally. She was also skillful enough to submit to intensive cross-examination. Nothing in her demeanor during the entire trial, including her long day on the witness stand, suggested in even the remotest way that she was not competent to stand trial.
The testimony of the expert witnesses, who reached a contrary result, was thus substantially outweighed by other more credible evidence.
Dr. Bauermeister's conclusion that the petitioner suffered a failure of memory, which he thought was likely evidence that "she experienced a dissociative reaction right after the shooting with psychogenic amnesia," was equally contradicted by the weight of the more convincing evidence. His conclusion was based upon information given him by the petitioner who used a process of selective memory, in which she was able to recount in florid and meticulous detail her life of abuse at the hands of her husband, including details of events in their married life going back some ten years, then pleading failure of memory on other issues.
Nor does a claim of amnesia, or "dissociative reaction" require the conclusion that she was therefore incompetent to stand trial. Amnesia, of itself, where a defendant had the ability to construct a knowledge of what occurred from other sources, as Ann McMaugh had, where she had some memory of what occurred and where she had the ability at the trial to follow what was happening at her trial and to discuss all matters rationally with her attorney does not constitute incompetency.United States v. Wilson, 263 F. Supp. 528 (1966); Wilson v. U.S.,391 F.2d 460 (1968).
Despite this recent claim of memory lapse for certain events, the petitioner had sufficient present ability at and near the time of trial to consult with her attorney with a reasonable degree of rational understanding and clearly had a reasonably rational as well as a factual understanding of the proceedings against her.
Moreover the conclusion of dissociative reaction was belied in other portions of Dr. Bauermeister's report. Ann McMaugh, according to Dr. Bauermeister, recounted in detail the methods she claimed her husband used to reconstruct and restructure the events from the point at which they first left the bar to return home for the guns. According to the petitioner's statements to Dr. Bauermeister, and others with whom she has been treating, her husband would insist that she had to say that she did not see him get the guns because she was in the bathroom at the time and the guns were on the table when she came out. But by her own admissions to the various experts, she knew that that version was not true, and in fact reported to Dr. Bauermeister that she contradicted her husband's version.
At her jury trial, at which Ann McMaugh freely made the decision to take the stand, she testified that she never saw the guns until she got into the car to return to the lounge with her husband and saw them on the console.
THE DEFENSE OF DURESS AND NEWLY DISCOVERED EVIDENCE
The law assumes that every defendant's actions were free from duress absent evidence to the contrary. The actions in question were those acts that resulted in Ann McMaugh shooting Gregory Dube. It is insufficient for an accused to show that, generally, he or she was subjected to various forms of physical and/or psychological abuse at the hands of the accused's captors. The defense of duress requires the person raising it to show that the actions relating to the crime, or the commission of the crime itself, flowed from and resulted from the intimidation of the captor. It is illogical to suggest, as petitioner here does, without any supporting facts, that because she was the victim of spousal abuse, discovered long after trial, she could have ipso facto raised the defense of duress to the murder charge. There was no evidence at all that Ann McMaugh at the times in question was the victim of coercion by Bernard McMaugh which was so immediate and of such a nature as to induce in her a well-grounded apprehension of death or serious bodily injury if she did not shoot Gregory Dube, or accompany her husband back to the Causeway Lounge.
At oral argument on the motion to dismiss, prior to the post-conviction hearing, the petitioner's counsel made a vigorous argument in support of proceeding to the evidentiary phase of the case when he urged that the most critical potential defense available to Ann McMaugh related to the issue of why Ann returned with her husband to the bar, knowing how violent he was. It was this failure to explain, according to her present counsel, that probably led the jury to conclude that husband and wife together set out to execute Gregory Dube. He suggested that a hearing would disclose that only if she went back to the bar with him could she avoid being beaten. That assertion was never supported by evidence at the post-conviction hearing. Indeed the record is totally devoid of evidence that Ann McMaugh was in fear of physical violence at that time and that she went back to the bar with her husband for fear of being beaten by him. Though petitioner has claimed that duress is relevant to the issue of malice, and that duress is a species of fear that can reduce first degree murder to manslaughter, the facts presented never supported those assertions.
United States v. Hearst, 563 F.2d 1331 (9th Cir. 1977) in a footnote at 563 F.2d 1335, sets out the traditional rule on duress:
 "A defendant who, without opportunity to escape, has a well grounded fear of imminent death or serious bodily injury unless he complies with his captor's wrongful commands entertains a mental state recognized as exculpatory with respect to most crimes. Compulsion or duress producing this state of mind is a defense to most criminal accusations."
In United States v. McClain, 531 F.2d 431 (9th Cir. 1976) the Ninth Circuit, noting that coercion by a third party can be a defense, underscored however that such coercion "requires more than threats." 531 F.2d at 438. Indeed, "the threat must be of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done". United Statesv. Gordon, 526 F.2d 406, 407 (9th Cir. 1975). In addition to a showing that the fear was well-grounded, it must be shown that there was no reasonable opportunity to escape.
This Court has approached the issue of duress and coercion recognizing that once some evidence raises such an issue, it is incumbent upon the State to prove the lack of duress and coercion and to establish beyond a reasonable doubt that the defendant was not acting under compulsion, as it also must when some evidence of insanity or of self-defense, is placed upon the record, in which case it is the burden of the state to prove legal sanity beyond a reasonable doubt, or that the act was not done in lawful self-defense beyond a reasonable doubt, as in the case of any essential element of the charged crime.
Testimony at the post-conviction hearing fell lamentably short of presenting any facts sufficient to raise the defense of coercion or duress or any fact relevant to the absence of malice. While it is true that the experts at the post-conviction hearing testified that the petitioner in her sessions with them painted an elaborate and richly detailed portrait of a very troubled marital life, there is a total absence of evidence that the petitioner believed that she would have been seriously hurt or killed if she did not shoot Dube, or even that she would have been seriously hurt if she did not accompany her husband back to the bar to confront Dube. There was furthermore no evidence that such fear, if it existed, was well grounded and that there was no reasonable opportunity for her to escape.
This Court must take note of the fact that the petitioner did not testify at the post-conviction hearing. While no evidentiary inference against her will be drawn by this Court, such failure did remove any opportunity she may have had to establish facts sufficient to show that she was coerced.
In determining whether the evidence labeled newly discovered has the potential for a different verdict, this Court has reviewed the entire trial transcript. That review convincingly demonstrates that there was substantial credible evidence, quite apart from the testimony of Ann McMaugh, to warrant her conviction for the crime of murder. Eyewitnesses testified to the dispute between the McMaughs and Dube earlier in the evening at the bar. They also testified that they saw the McMaughs sitting outside the bar after closing, that Dube was called over to the car, that two shots were fired, one of them killing Dube almost instantly. After the McMaughs fled the scene and were arrested while driving away, two guns, wiped clear of fingerprints and an ammunition case, partially wiped clear of fingerprints were found in the car. The guns were a .41 caliber Magnum and a .22 caliber semi-automatic. Each gun had been fired once. The real issue was whether or not Ann McMaugh and Bernard McMaugh were equally culpable in Dube's death. The jury concluded on sound, credible evidence that his murder was effected by a pas de deux.
In addressing this issue, reference must be made to the testimony presented by the petitioner in support of her claim made through her witnesses that she was not only abused and coerced by her husband, but that he exerted an almost Svengali-like influence on her that has persisted virtually to the present time, and that she was thus unable to make her own choices and decisions.
While Ann McMaugh was incarcerated and awaiting a hearing on her appeal from her conviction by the jury for the murder of Dube, she conferred with attorney Ira Schreiber with respect to her first post-conviction appeal. One of the associates in Mr. Schreiber's office, Sumner Stone, testified to a deteriorating relationship between Ann McMaugh and Schreiber. Stone testified at the post-conviction hearing that McMaugh would "quiz" Schreiber about her case, and would become dissatisfied with him when he would, in Stone's words, "dance around the issues". Ann McMaugh's dissatisfaction resulted in her firing Schreiber and retaining new counsel for her post-conviction issues. During this period of time, up to and including her post-conviction hearings, petitioner continued to assert to her psychiatrist, to her psychologist and to her attorneys that she was still in fear of her husband, Bernard, to whom she is still married, and who is incarcerated at the Adult Correctional Institutions.
This assertive behavior by Ann McMaugh, behavior that contradicts the portrait of a battered woman presented by Drs. Browne, Bauermeister and Kaiser, was evident even at the outset immediately after Dube's death, as well as during the time she testified before the grand jury and during her trial. That she was able to make her own choices and take matters into her own hands, free of the dominance of her husband, was clearly evident.
Immediately after the shooting, only Bernard McMaugh was arrested and charged, not Ann McMaugh. Despite the fact that she was neither arrested nor charged, she hired a noted and experienced criminal defense attorney, John F. Cicilline, to represent her. Her husband, charged with murder, had retained Joseph Capineri. From the outset, Ann McMaugh was making choices for herself. She felt entirely free, while her husband was under arrest for murder, to hire a different attorney from the one her husband had retained. She also felt free to discharge that attorney when she disagreed with his advice and to retain new trial counsel.
Her contacts with Cicilline need to be further detailed at this point.
In August of 1980, shortly after Dube's murder, and while Bernard McMaugh was being held awaiting a bail hearing, John F. Cicilline received a phone call about Ann McMaugh from a Massachusetts attorney named Crowley, with whom he later met. Cicilline later also met with Ann McMaugh and other persons, in all likelihood relatives of Ann.
This meeting occurred a few days before Bernard's scheduled District Court bail hearing wherein that court would determine whether Bernard would be held without bail pending his trial. Cicilline attended the bail hearing at which Joseph Capineri represented Bernard. The latter was released on bail. Thereafter, both Bernard and Ann would together confer with Cicilline, who throughout his representation of Ann McMaugh steadfastly maintained that Ann should not speak to the police or be a witness or go before the grand jury.
If Bernard was a batterer, he was an extremely ineffectual one as he tried over a period of nearly two years to persuade Ann to testify before the grand jury. Over the course of some ten to fifteen conferences with Ann and Bernard, Cicilline, according to his testimony, argued often and violently, that Ann ought not to say or do anything whatsoever. In Ann's presence, Cicilline told Bernard that it was an unwise course of action for her to testify. Cicilline's appraisal of Ann at that time was that she sat passively, had no real input in their conferences, merely shaking her head or saying yes at certain points. Meanwhile, plea negotiations were being conducted by Bernard's attorney in an attempt to reach an agreement under which the husband would receive a three year sentence, according to Cicilline, who also advised Bernard to "take his medicine," and do his time in jail, because he, Cicilline, did not want his client Ann to take the stand.
In 1983, Cicilline learned through published newspaper reports that his client Ann McMaugh had testified before the grand jury and had been indicted. He met again with Ann and Bernard, with whom he had another violent argument. Some time later, he learned that Ann McMaugh had fired him. She had hired William Dimitri.
Mr. Cicilline's initial interviews were with Ann McMaugh alone, while Bernard was at the Adult Correctional Institutions awaiting his bail hearing. At some of those interviews, Attorney Crowley and family members were present. The so-called "accident" version of the events seemed to have surfaced early in their conferences, although Cicilline was not certain when he first heard the version that included the gun being tossed into the back seat of the car. Whenever he spoke to Ann by telephone, he always asked her to come in alone, but after Bernard's release from jail, Bernard accompanied Ann to Cicilline's office. He testified that he would ask Bernard to leave, but Bernard would counter with an accusation that Cicilline was trying to separate them. Bernard would then, according to Cicilline say "we're in this together, right, Ann?", and Ann would answer yes. Cicilline felt that they were really seeing him to get his approval for her to go to the police. He felt that her story was illogical, and insisted she not go to the police.
When the attorney-client relationship further deteriorated, he felt that Ann no longer trusted him, and in fact she accused him of having other interests. "We didn't get along" was his characterization of their attorney-client relationship.
In the meantime, Crowley would telephone Cicilline at the latter's home, saying that the McMaughs were thinking of going to the police. The source of Crowley's knowledge was Ann McMaugh's family, or Ann herself. Cicilline would then call Ann McMaugh and tell her not to go to the police, but to come in to see him.
Cicilline also testified that Ann McMaugh never exhibited fear in his presence, that Bernard was never violent to her in his presence, that her behavior never changed, and that Ann did not indicate that she had a loss of memory. Ultimately, Ann McMaugh chose to testify before the grand jury.
The petitioner claims that she was subjected to extreme pressure by her husband, both mental and physical pressure, to tell a story before the grand jury that would take him off the hook. But the record is replete with references to Bernard's attorney, Joseph Capineri, frequently beseeching Cicilline to convince Ann to testify before the grand jury. This, of course, flies in the face of Ann's subsequent claims that she went to the police and the grand jury because she was subjected to intense abuse by Bernard. It is hardly logical or consistent for a husband who is given to the demonic behavior latterly ascribed to him by Ann to have to resort to his attorney speaking to his wife's attorney to get her to do his bidding. Abusing husbands are not known to use interlocutors.
With respect to the conclusion by the experts that the petitioner was a victim of spousal abuse who exhibited the "battered woman syndrome", certain contradictions to that finding, in addition to those already cited, must be noted.
Even evidence that is on its face apparently free from contradiction and inconsistency may be rejected when that testimony contains inherent improbabilities or contradictions which either alone or in connection with other evidence shows that testimony to be wrong or false. State v. Duggan, 414 A.2d at 792, citing with approval Correia v. Norberg, ___ R.I. ___,391 A.2d 94 at 98 (1978). Such is the case here.
As the evidence disclosed, Ann McMaugh was not economically isolated by her husband, nor financially dependent upon him. She worked and earned her own money. She was not socially isolated nor kept from her family. In fact, she actually worked for her father at his movie theater. She also had outside social contacts, both with and without her husband.[2]
But in an effort to show the "dominance" of Bernard McMaugh over Ann McMaugh, Dr. Browne cited the seating arrangement at the defense table during trial, noting that Ann McMaugh and Bernard McMaugh were seated side by side in the middle of the table, with their respective lawyers at each end, next to his client. This, according to Dr. Browne, was additional evidence of Bernard's "dominance" and of the fact that Ann McMaugh was never alone with her attorney, even at counsel table. (Browne, Tr. 124, 125). This naive conclusion was drawn by the witness without considering the fact that the petitioner and her attorney throughout the trial were actually elbow to elbow Nor was Dr. Browne aware that mere chance may have determined seating arrangements, or that seating arrangements are sometimes the result of custom, or perhaps a trial judge's suggestion to make it easier for each defense attorney to rise and move freely around the courtroom. At the hearing, Dr. Browne admitted she did not consider those factors. She chose to see an innocuous seating arrangement as another clever ploy by a brutal and dominating Bernard McMaugh to force his wife to sit next to him so that he could continue to exert control over her.
Ann McMaugh's demeanor at trial was also the subject of speculative and unfounded conclusions by her experts, none of whom as noted earlier had sat in on the trial, or indeed had even read the transcript of her trial. These experts noted that in fairly recent conversations with unnamed family members, they described Ann McMaugh as acting "like a zombie" at her trial. While statements by family members are useful sources of information for psychiatrists and psychologists, the reliability of those statements was never tested by the experts against the backdrop of Ann McMaugh's actual behavior or — most significant — of her testimony while she was on the witness stand.
Even a cursory review of the day-long testimony of the petitioner at her jury trial is clear evidence that Ann McMaugh was very verbal and intact during both direct and cross-examination, skillfully parrying cross questioning by a seasoned prosecutor. During the course of that day, Ann McMaugh responded in appropriate ways, never displaying evidence of a person brainwashed into parroting a story concocted for her by her husband. With respect to the suggestion that Ann McMaugh was in unwilling lock-step with her husband's defense, the closing argument by her trial attorney must be referenced at this point.
During his closing argument for Ann McMaugh, defense counsel repeatedly pointed the finger of blame at Bernard McMaugh as the force majeur in the events leading up to Dube's death. He also repeatedly suggested to the jury that his client, Ann McMaugh, was a subservient and obedient wife, that she found herself at the scene of the shooting "through no doing of her own", and that she was "propelled", presumably by her husband, into a situation "beyond her control." He further argued forcefully to the jury that the hand of responsibility was Bernard's and Bernard's alone, arguing "I think you can get the impression that Ann McMaugh is the kind of person, if Bernie says `Let's go for a drink', she goes for a drink."
This strong attempt to disengage the actions and motivation of Bernard McMaugh in returning to the bar to confront Dube from the actions and motivation of Ann McMaugh, and to portray Ann as the unwilling "victim" of a domineering husband, to depict her as having no control over the events of that evening may very well have succeeded, but for the day-long tour de force accomplished by Ann McMaugh when she testified. Far from being the battered, coerced and brainwashed witness she is now portrayed as, her performance on the stand was bravura; virtuosic, self-assured and also self-defeating.
Both in her direct testimony, and more especially on cross-examination, her self-confidence and independence were evident in the substance and cadence of her responses to questions. She even turned to the trial justice at one point to ask whether she had to pick up the gun and hold it, as the prosecutor had asked her to do on cross-examination. Indeed, her insistence that she knew nothing about guns, although she was forced finally to admit that she knew how to load them, was characterized by the prosecutor in her closing as Mrs. McMaugh's "Little Miss Muffet Act". Her range of understanding, and her verbal skills, her ability to parry questions and the strong assertive manner in which she responded on cross-examination, including the speed and dexterity with which she picked up the .22 caliber semi-automatic death weapon to demonstrate a point, were all indicia of an independent minded, strong willed, intelligent, intact person, a person totally at variance with the portrait of herself she has since painted during her post-trial meetings with her mental health professionals.
So strong was her performance on the stand that the Court specifically referred to the effect of her demeanor upon the jury. (Trial tr. 754).
Ann McMaugh's trial attorney, William Dimitri, testified at the post-conviction hearing about the way he had been retained. He recalled that he received a call from Ann McMaugh, who told him that she had been indicted, that her attorney had been John F. Cicilline, that she had a conflict with her attorney and that she was seeking new counsel. When William Dimitri first saw Ann McMaugh at his office, she was accompanied by her husband. Dimitri testified that Ann McMaugh did most of the talking, principally explaining why she no longer wanted John F. Cicilline as her attorney; he had given her certain legal advice which she chose not to take, resulting in a dispute between her and Cicilline.[3]
Dimitri testified that during the course of preparation for trial, he discussed with her those statements she made to the police, as well as her testimony before the grand jury. Dimitri explained to her that there were "serious problems" with her grand jury testimony. He also testified that although Bernard McMaugh always accompanied Ann to his office, Bernard never interfered with his talking to her, and never led the conversation with her. Dimitri detected nothing odd about the situation. He testified that although he felt that her grand jury testimony had "locked in" a defense based upon a claim that the gun accidentally discharged, hitting Dube, as she tried to throw the gun into the back seat out of Dube's range, he felt that the forensic evidence against her was not insurmountable. He testified that he saw "nothing wrong" with her defense.
He also testified that her instructions were that a joint defense had to be conducted. Ann McMaugh, according to Dimitri, was insistent that it was a "joint thing . . . we fall together."
He further testified that the instructions from her were to drop the motion to sever; he also decided, after interviewing her, that they had no basis for moving to suppress her statements.
Dimitri testified that he was never aware that Ann McMaugh was being physically or psychologically abused by her husband and that had he been, he could have mounted a different defense. In his words, "I could have implied that she was forced to go (back to the bar with Bernard)." This, however, is precisely what he, an astute defense attorney, argued to the jury. Indeed, his well-developed trial antennae made him question whether the event happened the way she described, but, as Dimitri testified, his hands were tied because Ann McMaugh "was insistent" that the incident happened the way she described it, adding that she didn't think it would be fair for Bernard to go to jail even for a day for something she had done. Plainly, she wanted to take the stand for that reason.
It was clear to Dimitri that her obvious purpose was to exculpate Bernard. He also said that their relationship seemed amicable, that each expressed concern for the other's welfare, that he never heard or saw anything to the contrary.
Dimitri's testimony concerning Ann McMaugh's demeanor and competency is in stark contrast to the conclusions expressed by Drs. Bauermeister, Browne and Kaiser, as well as members of her family who of late have reported to Ann's doctors that she appeared to be like a "zombie", and in a "trance" during her trial.
Dimitri recalled that Ann McMaugh knew the functions of the various components of a trial, she was communicative to him, she was able to respond appropriately to his questions, she was polite, refined and verbal, and not overly talkative. He also stated, under cross-examination, that he had no reason to believe she was incompetent. Moreover, the claim that the grand jury and police statements "locked" in an improbable defense is undercut by the fact that she chose to testify at her trial.
The record in this case is barren of evidence to suggest that Ann McMaugh's husband coerced her into accompanying him back to the bar or that she was physically, emotionally or psychologically forced to shoot Gregory Dube. The so-called "campaign of physical and psychological torture" reported in the testimony of Dr. Browne had no factual relevance to the events that occurred that evening. Ann McMaugh's own reporting to her experts of what occurred that evening suggests quite a contrary conclusion. The premise adopted by the petitioner's experts that Ann McMaugh was coerced by her husband into telling a false story in order to exculpate her husband is simply unsupported by the facts. Because the experts chose to conclude that she was a "battered woman", they also assumed that Bernard's efforts at rehearsing Ann McMaugh on the so-called "accident" defense was a coercive effort to clear him. It is more probable, however, based upon Ann McMaugh's trial testimony and the forensic testimony, including Bernard's statements immediately after the shooting and the fact that both guns were wiped clean while Bernard was busy driving away from the scene of the murder, that Ann McMaugh leaned across her husband, aimed, and deliberately fired the .22 caliber semi-automatic weapon within inches of Dube's face. The bizarre rehearsals of an "accident" story could be nothing more than Bernard's inept efforts to insulate his wife from a murder charge.
The petitioner has argued that "[the] fulcrum of this claim for relief is the unanimous expert opinion that Ann McMaugh was systematically brutalized and battered for nearly a decade by her husband . . ." The petitioner also urges that the testimony of experts on battered woman's syndrome is relevant and probative on intent issues in criminal cases, citing cases from nine jurisdictions in which expert testimony on battered woman's syndrome was admitted as being relevant and probative to those issues.
None of the cited cases is precedent for a holding that such testimony is admissible in the precise circumstances here. In the cited cases, and in other jurisdictions where such testimony has been admitted, the evidence has been held to be relevant to the issue of the intent, or state of mind, of defendants who are accused of the murder of their batterers. No known reported case has considered whether such evidence is probative of any fact in issue where a battered person is accused of the murder of a stranger. The relevance of such testimony depends on whether the evidence proffered tends to prove or disprove a point provable in the case, that is to say whether the evidence has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without such evidence.
None of the evidence presented at the hearing either newly discovered or newly available has the potential for changing the verdict, or for calling for a lesser included instruction to a jury. In sum, the evidence, if believed, paints a picture of a dismal marriage and a cruel husband. But however much one may sympathize with a person who claims to be the victim of such brutality, this Court can find utterly no connection between the petitioner's claimed status as a battered woman and a defense to this charge of murder. Petitioner's status as a battered woman in the circumstances presented here is as much happenstance as is her height or the color of her hair and is totally irrelevant to the charge that she murdered not her husband batterer, but Gregory Dube, a person she barely knew.
This Court has exhaustively reviewed the trial exhibits, trial testimony, closing arguments to the jury, arguments on the motion for a new trial, decision on the motion for a new trial and the sentencing hearing, as well as the testimony, exhibits, and depositions presented at the post-conviction hearing, and concludes that there is not the faintest possibility that the evidence petitioner seeks to address and present at a new trial will give rise to a reasonable doubt as to the petitioner's guilt on any of the charges.
The petition for post-conviction relief is denied.
[1] The petitioner's husband filed a motion to intervene in the post-conviction hearing. That request was denied after a hearing.
[2] In addition, according to the pre-sentence report, Ann and Bernard together went to a psychologist for counselling sessions, unusual in most abusive relationships of the kind described here.
[3] Despite petitioner's pre-hearing claim, there was no evidence that Capineri acted as attorney for Ann McMaugh when she appeared before the grand jury.